STATE OF MARYLAND ET AL. *v.* McCRAY ET AL.

[No. 45, September Term, 1972.]

*Decided December 1, 1972.*

112

*Motion for rehearing filed December 29, 1972; denied January 19, 1973.*

The cause was argued before BARNES, MCWILLIAMS, SINGLEY and DIGGES, JJ., and CHARLES E. ORTH, JR., Associate Judge of the Court of Special Appeals (now Chief Judge of the Court of Special Appeals), W. ALBERT MENCHINE, Associate Judge of the Third Judicial Circuit

(now Associate Judge of the Court of Special Appeals) and JAMES L. WRAY, Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Henry R. Lord, Deputy Attorney General* and *Donald R. Stutman, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Josef E. Rosenblatt, Emory A. Plitt, Jr.,* and *Harry A. E. Taylor, Assistant Attorneys General,* on the brief, for appellants.

*Julian Tepper* and *W. Anthony Fitch* for appellees.

*Amicus Curiae* brief filed by Baltimore Legal Aid Bureau, Inc., Prisoner Assistance Project, *Charles F. Morgan* and *Michael A. Millemann* on the brief.

ORTH, J., delivered the opinion of the Court.

Almost 2000 years ago Juvenal asked: "Sed quis custodiet ipsos custodes?" [1] Who will watch the keepers themselves is still a question of critical importance, and the need of a proper solution is never more acute than when the rights of the individual are involved. A declared purpose of the federal constitution is to "secure the Blessings of Liberty" to the people and their posterity,[2] and under our philosophy of government the rights guaranteed by the constitution of the people are jealously guarded. Curtailment of them is to be permitted only to the extent necessary to maintain the fine balance between the rights of the individual and the rights of society.

## I

The appeal before us concerns persons from whom the demands of society have lawfully taken a fundamental right—freedom, or liberty from incarceration. Each of them through the due processes of the law has been found

---

**1.** *Juvenalis Et Persius,* published by Gulielmus Pickering, London, 1835, *Satira,* VI, p. 140, line 347. Juvenal (Decimus Iunius Iuvenalis), a Roman satirist and poet, circa A.D. 60-140. See Encyclopaedia Britannica, vol. 13 (1959).
**2.** Preamble to the Constitution of the United States.

guilty beyond a reasonable doubt of the commission of a crime and sentenced to imprisonment. However, none of them is incarcerated in a penal institution. The legislature has established a special category of criminal known as the defective delinquent.[3] *Director v. Daniels,* 243 Md. 16, 49, 221 A. 2d 397 (1966). The Maryland Defective Delinquents Act, Code, Art. 31B, provides that a person convicted of any felony, or certain misdemeanors, and sentenced in a court of this State, may be committed to the Patuxent Institution (Patuxent) for an indeterminate period, if it is judicially determined that he is a "defective delinquent". *McNeil v. Director,* 407 U. S. 245, 92 S. Ct. 2083, 32 L.Ed.2d 719 (1972). We have stated that the legislative history of the Defective Delinquents Act "clearly demonstrates that its sole objective and purpose was not penal but an effort to segregate a known group of mentally disordered people who are found guilty of criminal acts, by confining them in an institution housing only members of their group in a sole effort to protect society and provide treatment to effect, if possible, a cure of the illness." *Director v. Daniels, supra,* at 38. We said: "From the history it is clear that the legislative imposition of sanctions by restraining the individual results from studies that indicate that such restraint is necessary both for the protection of society and to provide medical treatment to further curative measures." *Idem.* The persons concerned in this appeal are inmates of Patuxent, either detained there for examination as possible defective delinquents, or confined there upon judicial determination that they are defective delinquents. Code, Art. 31B, §§ 6-9. See *McNeil v. Director, supra; Murel et al. v. Baltimore City Criminal Court,* 407 U. S. 355, 92 S. Ct. 2091, 32 L.Ed.2d 791 (1972).

---

3. A defective delinquent is defined as "an individual who, by the demonstration of persistent aggravated antisocial or criminal behavior, evidences a propensity toward criminal activity, and who is found to have either such intellectual deficiency or emotional unbalance, or both, as to clearly demonstrate an actual danger to society so as to require such confinement and treatment, when appropriate, as may make it reasonably safe for society to terminate the confinement and treatment." Code, Art. 31B, § 5.

## II

During the first six months of 1971 sixteen inmates of Patuxent filed fifteen actions in the Circuit Court for Montgomery County and six actions in the Circuit Court for Howard County.[4] Nine of the actions prayed for the issuance of a writ of habeas corpus and twelve of them sought an "ex parte injunction." [5] See Appendix A. The habeas corpus actions sought relief from cruel and unusual punishment prohibited by the eighth amendment and denial of the due process of law guaranteed by the fourteenth amendment. The cruel and unusual punishment pertained to conditions and practices to which the inmates alleged they had been subjected, including extended confinement in disciplinary and administrative segregation units. The procedures by which they were transferred to such segregation units were claimed to be lacking in due process of law. They sought declaratory and injunctive relief from censorship practices which they asserted were unconstitutional as violative of their rights under the first, fourth, sixth and fourteenth amendments. The cases were consolidated [6] and it was stipulated

---

4. Twelve of the inmates were a party to more than one case. Two inmates joined in five cases, one in four cases, seven in three cases and two in two cases.

5. Appellants refer to a Consolidated Bill of Complaint filed on 14 July 1971 in the Circuit Court for Montgomery County. They quote from it:

> "Habeas Corpus is sought pursuant to Article 42 of the Annotated Code of Maryland, 1971 Replacement Vol. Declaratory relief sought pursuant to Article 31A of the Annotated Code of Maryland, 1967 Replacement Vol. Injunctive relief is sought pursuant to Maryland Rules BB70 thru BB80 of the Maryland Rules of Procedure, 1971 Cumulative Supplement."

We do not find this document in the record before us and it is not set out in the joint record extract.

6. Appellants state in their brief that on 16 July 1971 "the petitions in the Circuit Court for Howard County were ordered consolidated with the petitions in the Circuit Court for Montgomery County" by the Chief Judge of the Court of Appeals. The authority for this assertion is the statement in the opinion of 18 November 1971 of the hearing court to like effect. No such order is in the record before us. There is, however, an order dated 14 April 1972 issued by Watts and Miller, JJ. that the cases be consolidated.

that the consolidated cases constituted a class action within the contemplation of Maryland Rule 209 "for all persons within the Patuxent Institution who were in a similar position to these petitioners." The cases were heard by Miller and Watts, JJ.[7]

An evidentiary hearing of thirteen days was held at Patuxent during the period 22 July to 13 August 1971, followed by oral argument on 31 August. The opinion and order of the court dated 11 November was filed 18 November. The court concluded that the three areas of complaint—"the alleged absence of procedural due process, cruel and unusual punishment and mail censorship"—could be "corrected by the adoption of certain prescribed rules and regulations to govern future conduct of the Patuxent Institution and by a change in some of the Institution's present policies." It appended the rules in these areas to its opinion and order. However, in addition to the three principal contentions of appellees, it discovered "other matters" which it felt required attention and it also appended rules and regulations in these areas "to correct practices and bring the Patuxent Institution within constitutional bounds." It pointed out: "Except in a few places where drafted to implement constitutional guarantees covered in the opinion, the following rules [appended] were supplied by counsel for the petitioners, the Attorney General's office and the Patuxent Institution. * * * Where there has been a conflict in the rules or proposals the Court has selected the rule which is most applicable according to the controlling case law." The rules appended were under the following main headings: Violations, Punishment, Disciplinary Procedures, Disciplinary Segregation Regulations, Administrative

---

7. By three orders dated 21 April 1971 the Chief Judge of the Court of Appeals designated H. Ralph Miller, Associate Judge of the Sixth Judicial Circuit, "To sit either alone or with one or more Judges, as a Judge in the Circuit Court for Howard County" and Robert B. Watts, Associate Judge of the Supreme Bench of Baltimore City, to so sit as a Judge in the Circuit Court for Montgomery County and in the Circuit Court for Howard County, each to participate as a Judge of said courts in the determination and decision of the cases.

Segregation Regulations, Patient Correspondence Rules, Medical Facilities, Visiting Rules, Searches, Physical Force by Custodial Personnel, Dietary Regulations. The court ordered "the Board of Patuxent Institution to comply in all respects with the matters set forth in this opinion and to promptly adopt the rules and regulations appended hereto and to otherwise discontinue those practices and procedures which violate the inmates' constitutional rights." It reserved jurisdiction over the petitions and the subject matter thereof for one year "to see that its orders are complied with." The rules and regulations were "to be published and furnished to each patient presently in or hereafter coming to the Patuxent Institution."

On 1 December appellees filed a petition for appellants to show cause why they should not be held in contempt for failure to comply with the order of 11 November. Upon hearing on 20 December the lower court rescinded its order filed 18 November and appellants dismissed without prejudice an appeal they had noted. The order of 20 December directed that appellants "immediately make reasonable effort to adopt and implement procedures that are in substantial compliance with the rules and Court's opinion, that the opinion of the Court of 11/18/71 is adopted as the Opinion of the Court and that the order of the Court is rescinded subject to the court entering a final order thereafter; that Respondents file with this Court within thirty (30) days from the date of this Order a comprehensive set of rules and regulations which are in substantial compliance with this Court's opinion and rules appended thereto of November 18, 1971; that Petitioners shall note to this Court any objections to the rules and regulations filed by Respondents within thirty (30) days of the date the rules and regulations are filed with this Court; further, after consideration of the rules and regulations and any objections thereto filed with this Court, a hearing will be ordered at which time argument by counsel will be heard and a final order of this Court will be rendered subsequent to such hearing." A hearing was held on 17 January 1972 fol-

lowing a series of conferences in which counsel for all parties participated. Agreement was reached on over two hundred rules and regulations pertaining to the operation of Patuxent and the treatment of its inmates.[8] There was discord on only ten matters. It was agreed that the court would decide the constitutional sufficiency of appellants' proposals on the disputed matters based on memoranda submitted and without further hearing. The court's determination was set out in its order of 24 February 1972, filed the next day. Appellants' proposals as to four of the matters were found to be constitutionally sufficient and the court found no need for further action with regard to them.[9] The court found that there was constitutional deficiency in the failure to require:

(1) an independent hearing officer on the institutional disciplinary committee;

(2) an officer to be stationed full time to service disciplinary segregation areas;

(3) daily visits to the disciplinary segregation areas by the institution's physicians;

(4) accelerated treatment and therapy for inmates in the administrative segregation unit;

(5) nutritional substitutes to be provided for persons unable because of religious belief to eat the regular institutional fare.

---

8. The rules and regulations were divided into ten general areas: I Violations; II Actions Available to Disciplinary Committee; III Disciplinary Procedures; IV Administrative Segregation Regulations; V Correspondence; VI Medical Facilities; VII Visiting; VIII Searches; IX Physical Force by Custodial Personnel; X Dietary Regulations. Each was treated with specificity, delineating within those areas the powers and responsibilities of the Patuxent authorities, the rights and obligations of the inmates, and the duties of both.

9. As designated by the lower court they were:
(1) The differentiation between major and minor violations.
(2) The right of the Patuxent Institution to relieve patients of their job assignments as a disciplinary measure.
(3) The substitution of sandwiches for meals as a disciplinary measure.
(4) The right of an officer to make an immediate search without contacting a superior officer.

The sixth area of disagreement concerned censorship of inmates' mail. The court ordered:

(1) that appellants promptly implement those rules and regulations agreed to and found by the court to satisfy constitutional requirements in the areas covered;

(2) that appellants file with the court new rules and regulations in those areas where ordered by this opinion within twenty days of the date of this Order and at the same time furnish copies to the attorneys for the petitioners;

(3) that "the court shall retain jurisdiction of this case for a period of one year from the date of this Order to insure compliance not only with the rules consented to but to hear objections from the petitioners as to any of the new rules ordered to be submitted and further to prepare and implement its own rules and regulations in any area where the respondents fail to substantially comply with this Opinion and Order";

(4) that "all of the rules and regulations adopted now and hereafter shall be furnished in written form to each patient confined at the Patuxent Institution within twenty-four hours after his confinement there."

On 17 March 1972 appellants noted an appeal "from the Opinions and Orders entered in this action on the 11th day of November 1971 and the 24th day of February 1972." [10]

---

10. As to the order of 11 November 1971, not only had the authorized time for appeal elapsed, Maryland Rule 812 a, but, in any event, there was nothing from which to appeal because that order had been rescinded by the court's order of 20 December 1971. It appears that appellants agreed to dismiss the appeal to the order of 11 November 1971 timely noted on 30 November "while reserving their right to argue subsequently those substantive findings in the Opinion and Order." Although the order of 20 December so recited, no such reservation appeared in the actual recision of the order of 11 November. However, the opinion of

On 12 April 1972 appellees filed a petition alleging non-compliance with the court's orders and praying that the court "take necessary steps to enforce its Orders by requiring Respondents to SHOW CAUSE why this Court should not" hold all "who have failed or refused to comply with the Opinions and Orders of this Court of November 18, 1971, and February 24, 1972" in contempt, and why it should not issue seven designated orders [11] and "order any other relief necessary to insure compliance with the Opinions and Orders of this Court." In the interim appellants had filed, on 23 March 1972, a

24 February 1972 incorporated by reference so much of the opinion of 11 November 1971 and the rules and regulations appended thereto which related to the matters remaining in dispute. In the opinion of 24 February 1972 the court opined as to the disciplinary committee that appellants should draft a rule providing that one member be "some outside person other than a staff member or employee" of Patuxent. It stated: "The new rule should comply with the Court's original Opinion and be substantially similar to that rule providing for the disciplinary committee which was previously stricken from the original appendix." The rule with respect to a full time officer in the disciplinary segregation unit was to be "in accordance with its original Opinion." With regard to treatment of inmates in the administrative segregation unit, the court made clear that a new rule should be drafted to provide "intensive treatment" as that was the real thrust of its former opinion. As to nutritional substitutes, the court found no reason to depart from the requirement of its original order and ordered appellants "to promptly submit a rule which will effect substantial compliance in this area with the Court's Opinion" of 11 November. On the matter of mail censorship the court found "no reason to adopt anything less than a rule which substantially complies with the original rules set forth in the appendix of the Court's Opinion [of 11 November 1971] regarding patient correspondence." It therefore ordered appellants "to promptly redraft their rules on patient correspondence in substantially the same form as those rules included in the original appendix." Thus, those parts of the opinion and order of 11 November 1971 so referred to in the opinion and order of 24 February 1972 would necessarily be before us on this appeal in any consideration of the matters covered thereby.

11. Including a daily fine or imprisonment or both as to those who have failed to comply with the orders, the release or transfer of all inmates of Patuxent of petitioners' class, the enjoining of commitment to Patuxent, the appointment of an officer of the court to implement the opinion and orders, the enjoining of the placement of any inmate in segregation, the filing by appellants "at intervals determined by the Court, [of] comprehensive and specific reports showing any steps taken to implement the Opinions and Orders of the Court", and the placing in immediate effect constitutionally adequate rules and regulations pertaining to the six matters in dispute.

motion for stay of execution of the order of 24 February 1972.

A hearing was held on 26 April 1972. The record before us contains a transcript of only that part of the hearing concerning the rules and regulations relating to the six matters in dispute.[12] It shows that appellants offered as compliance with the direction in the order of 24 February 1972 to file rules in the disputed areas as were appended to the order of 11 November 1971. Appellants made clear, however, that they disagreed with the rules so offered. "We feel they are * * * not Constitutionally required; and for the purpose of the record, we cannot abide by the same. * * * And that the State would submit that if required under the order of February 24 to submit rules in these areas in substantial compliance to the Court's Opinion, it would have to submit these rules to the Court; and we further state that they cannot agree to them and feel they are not required and state to the Court that we would have to appeal from these rules, but that being required by the Order of February 24 to submit rules to the Court in conformity with its original Opinion, we proffer them as the rules we would submit with the obvious objection to them. * * * [We] feel that (a) they are not Constitutionally required; and (b) there was insufficient evidence in the record to support the implementation of these rules." The court below "upon the joint oral motion by counsel for Petitioners and Respondents" made in open court on 26 April 1972:

> "ORDERED that the attached Rules and Regulations are received by this Court as the submission of Patuxent Institution pursuant to the Order of February 24, 1972; and
>
> IT IS FURTHER ORDERED that this Court accepts and adopts these Rules and Regulations *nunc pro tunc* as of February 24, 1972, without

---

12. The partial transcript of the hearing of 26 April 1972 and a copy of an order passed upon that hearing were included as exhibits to appellants' Answer to a motion of appellees to dismiss the appeal.

prejudice to the rights of Respondents to appeal or to any further rights of Respondents; and

IT IS FURTHER ORDERED that Respondents implement the attached Rules and Regulations within a reasonable time; and

IT IS FURTHER ORDERED that the attached Rules and Regulations and the partial transcript be transmitted to the Court of Appeals of Maryland for inclusion in the Record on appeal without the necessity on the part of Respondents to file a further Notice of Appeal."

Appellants' brief sets out:

"Subsequent to the hearing of April 26, 1972, hearings were held at Patuxent Institution on June 2 and 5, 1972, on Appellants' Motion for Stay of Execution of Order which was denied by the lower court on June 5, 1972. Hearings were further held at Patuxent Institution on June 5, 19 and 20, 1972, on Appellees' Petition for Contempt. On June 20, 1972, the lower court denied Appellees' first eight grounds for relief, but required Appellants to file affidavits of compliance with the Rules and Regulations previously agreed to by September 1, 1972, and following Appellees' subsequent affidavits, the lower court will determine whether to hold further hearings on Appellees' Petition for Contempt. The lower court further suggested that because of the stay granted by this Court of the six areas on appeal, that Appellants review the admission procedures for the administrative segregation unit with the purpose of revising the same."

We do not find in the record before us a transcript of any proceedings held after 26 April 1972, or any orders of the court below emanating therefrom. The stay granted by this Court to which appellants refer was by order of

9 June 1972 "that the execution of the order of June 5, 1972, of the Circuit Courts for Montgomery and Howard Counties in Misc. Petition No. 4363 *et seq.*, requiring the appellants to immediately implement certain rules and regulations in six disputed areas be, and the same is hereby, stayed until the further order or mandate of this Court, * * *."

## III

Appellants challenge only two parts of the order of 24 February 1972 on this appeal:

(1) the mandate that they file with the court new rules and regulations in the six areas in dispute;

(2) the retention by the court for one year of its jurisdiction of the case.

The challenge as to the first is on the basis that the rules and regulations proposed by them were constitutionally sufficient and that rules and regulations complying with the court's order are not constitutionally mandated. As to the second, appellants assert that "once this Court rules, the work of the lower court in instituting broad changes in the Rules and Regulations at Patuxent Institution will have been completed." They urge retention of jurisdiction by the court below places an undue burden on the court and appellants, for the effect would be that the lower court would be adjudicating "each and every complaint made by Appellees, including those things which do not raise themselves to the level of a constitutional deprivation," in short taking control of and governing the day-to-day operations of Patuxent.

Appellants do not question the jurisdiction of the court below or the propriety of the power and authority it exercised. In fact all parties and the lower court itself are content because the jurisdiction of the court was stipulated. At the very beginning of the hearings the Assistant Attorney General, after noting that "there has been some basis in the case law that the Courts have had hands off on the administration, or running institutions,"

said that he wanted "to state for the record at this point that the State of Maryland, the Director of Patuxent Institution, and the Patuxent Institution does not intend in these proceedings to raise any question as to the jurisdiction of this Court to hear the case, as to the venue of the case, or any of those questions that we recognize at this time. The time has come for their grievances to be held before a Court, and we will not raise any of those objections, and we feel the issue that lies before this Court, as set forth in the petition, really goes to the question, and we well realize, to administration. We want to have an opportunity to have this heard out in a Court, and to have their grievances resolved. * * * The question here is not whether the defective delinquent law is constitutional or not, but whether it is being applied properly, whether these men in the institution are being given constitutional standards in the limits of the complaint, and we are willing to have this issue before the Court, and I understand the issues are quite clear. We will waive any jurisdiction so these men can have their day in Court and air their differences." On 20 December 1971, at the hearing which resulted in the court rescinding its order filed 18 November, "all parties, by and through counsel" entered into a written stipulation, the first item of which was "that the Court has jurisdiction to hear and decide the issues in the above captioned matter." By the second item appellants agreed during the pendency of the case to make "every effort to operate Patuxent Institution for Defective Delinquents in substantial compliance with the provisions of the November 18, 1971 opinion and rules appended thereto." In the third item appellants and appellees through their counsel agreed to consult with each other "as part of their effort to operate Patuxent Institution in substantial compliance with the provisions of the above mentioned opinion and rules appended thereto and as part of their duty to file with this Court a comprehensive set of rules and regulations which are in substantial compliance with said opinion and order." The fourth and final item read:

"Where parties are unable to agree upon the Constitutional sufficiency of any proposed rules and regulations, the court shall have jurisdiction to determine the minimum requisite standards which such rules and regulations must embody; if respondents [appellants] do not thereafter within a period of time to then be set by the Court, adopt and implement such rules and regulations, the Court shall have jurisdiction to order the adoption of such rules and regulations subject to all rights of appeal."

We first note that a question of the jurisdiction of the lower court, even though not tried and decided below and neither briefed nor argued, may be raised by this Court, *sua sponte*, as an exception to the general rule established by Maryland Rule 885. *Stacy v. Burke*, 259 Md. 390, 402-403, 269 A. 2d 837 (1970) ; *Tate v. State*, 236 Md. 312, 316, 203 A. 2d 882 (1964) ; *Webb v. Oxley*, 226 Md. 339, 343, 173 A. 2d 358 (1961) ; *Heath v. State*, 198 Md. 455, 466, 85 A. 2d 43 (1951) ; *Berlinsky v. Eisenberg*, 190 Md. 636, 640, 59 A. 2d 327 (1948). Next, we observe that jurisdiction cannot be conferred on a court by waiver or consent of the parties. *Jones v. Jones*, 259 Md. 336, 342, 270 A. 2d 126 (1970) ; *Killen v. American Casualty*, 231 Md. 105, 109, 189 A. 2d 103 (1963) ; *Cook v. Aronheim*, 186 Md. 138, 145, 46 A. 2d 105 (1946) ; *Park Land Corp. v. M. & C. C. of Balto.*, 128 Md. 611, 617, 98 A. 153 (1916). Our initial inquiry, therefore, is whether the lower court had jurisdiction over the subject matter.

## IV

The Department of Public Safety and Correctional Services (the Department) is a principal department of the State government, headed by the Secretary of Public Safety and Correctional Services (the Secretary). Code, Art. 41, § 204 (a). The Secretary is directly responsible to the Governor and shall counsel and advise the Governor on all matters assigned to the Department. Among

the areas in which he is responsible for carrying out the Governor's policies is the treatment of defective delinquents, § 204 (b). The Patuxent operation is assigned to the Department. The Patuxent Institution, the Board of Patuxent Institution, the Advisory Board for Defective Delinquents, and Institutional Board of Review are within the Department, § 204A (a). The Secretary shall appoint, with the approval of the Governor, a deputy secretary for correctional services who shall assist the Secretary with respect to and be primarily concerned with the operations, among others, of the Patuxent Institution, the Board of Patuxent Institution and the Institutional Board of Review, § 204B (a). The appointment or removal of personnel of any board, commission, division, or other agency within the jurisdiction of the Department is subject to the approval of the Secretary, § 204B (c). The Secretary is responsible for the budgets of the agencies within the jurisdiction of the Department, § 204C (a). He shall review and shall have the power to approve, disapprove or revise the rules and regulations of the agencies within the jurisdiction of the Department, § 204C (b).

The Patuxent Institution is established by law as part of the Department as an institution for defective delinquents with the powers and duties bestowed upon it by statute, Code, Art. 31B § 1 (a). The Board of Patuxent Institution (the Board) subject to the authority of the Secretary, possesses all of the powers bestowed upon Patuxent, § 1 (b).[13] The Board has any and all incidental powers and authority appropriate and convenient to enable it to fully discharge the powers of management, control and supervision conferred upon them, § 1 (e). It has, subject to the review and power of approval, disapproval and revision of the Secretary as above noted,

---

13. The Board consists of a chairman and four associate members appointed by the Secretary with the approval of the Governor and with the advice and consent of the Senate. Two of the associate members shall be appointed from the membership of the advisory Board of Patuxent, and one of those two shall be a psychiatrist. Idem.

"full power and authority to make, repeal or amend such rules and regulations, not inconsistent with law or applicable rules and regulations of other State agencies, for the operation, discipline and conduct of the Institution, the inmates, staff and employees," under its supervision and control, "as may be necessary or convenient for the proper administration of the power and discretion conferred upon it * * *," § 1 (f). The chief administrative officer of Patuxent is the Director, serving at the pleasure of the Secretary, and appointed by him from a list of three nominees proposed by a special committee, § 2. The Director shall be "a trained, able and competent psychiatrist with at least five years experience in the practice or teaching of psychiatry," *idem.* The advisory board for defective delinquents is a part of the Department. It shall confer with the staff of Patuxent and with the Board from time to time, and shall give to the Institution a general consultative and advisory service on problems and matters relating to its work, § 4 (a).[14]

It is the duty of the institutional board of review to review and thoroughly reexamine every person held in custodial care as a defective delinquent not less frequently than once in every calendar year to determine whether he shall remain classified as a defective delinquent. It shall make a recommendation for the future status and treatment of each person so reviewed and reexamined, in writing, and a copy of every such recom-

---

14. The advisory board "shall consist of the professor of psychiatry in the Medical School of the University of Maryland, or someone designated by him; the professor of psychiatry at the Johns Hopkins Medical School, or someone designated by him; two competent sociologists from the University of Maryland and the Johns Hopkins University, one each to be appointed by the respective president of these two institutions; the full-time professor of constitutional law at the University of Maryland School of Law, or if there be no such full-time professor, or if he is unable to serve, such other full-time professor of the University of Maryland School of Law as may be designated by the dean of said school; the Director of Parole and Probation; and two practicing members of the Maryland bar, with at least five years experience in the trial of civil and/or criminal cases." They are appointed by the Secretary of Public Safety and Correctional Services with the approval of the Governor.

mendation shall be filed with the records of the Institution. Code, Art. 31B, § 13 (b). See §§ 13 (a), (c), (d), (e) and (f) relating to duties of the institutional board of review.[15]

By these statutory provisions the legislature has made pellucidly clear that the management, control, and supervision of Patuxent is the exclusive responsibility of the executive branch of the government. In so doing it has also recognized that the comprehensive scheme it has established for examination, commitment, treatment, and release of persons of a medically and legally recognizable class of persons, focusing on the mental and emotional condition of those thought to be members of this statutorily defined class, see *Bailey v. State,* 12 Md. App. 397, 277 A. 2d 246 (1971), requires guidance and direction from professionals and experts in disciplines related thereto,[16] but without eroding the overall authority of the executive branch acting through the Board and director to the Secretary and Department. We do not believe that the judiciary may usurp this authority of the executive branch and assume its responsibilities.

The decisions of this Court have made clear our belief that it is not the function of the judiciary to superintend the treatment and discipline of prisoners in the State penal institutions and by analogy, in Patuxent. We consistently and firmly adhered to the position that "the courts have no function to superintend the treatment of prisoners in the penitentiary, but only to deliver from prison those who are illegally detained there." *State*

---

**15.** "The institutional board of review shall consist of the director, the three associate directors, the professor of the University of Maryland School of Law who is a member of the advisory board, either of the members of the Maryland bar who are members of the advisory board and a sociologist to be appointed by the board of Patuxent Institution from the faculty of an accredited institution of higher education in Maryland." Code, Art. 31B, § 12.

**16.** Thus the Secretary may in his discretion exercise or perform any power, duty, responsibility or function which Patuxent is authorized to perform except for those powers, duties, responsibilities and functions of the advisory board for defective delinquents, and of the institutional board of review and relating to examinations for determination of defective delinquency. Code, Art. 41, § 204C (c).

*ex rel. Renner v. Wright,* 188 Md. 189, 192, 51 A. 2d 668 (1947). There came to us a spate of applications for leave to appeal from denial of petitions for writs of habeas corpus based on the complaints of prisoners with regard to their treatment by correctional authorities. We denied them all with no attempt to consider the merits of the grievances, stating that such matters did not entitle the petitioner to relief under habeas corpus. There was a variety of complaints. Renner said he was suffering from stomach ulcers and was unable to obtain proper medical treatment. In *State ex rel. Jacobs v. Warden,* 190 Md. 755, 59 A. 2d 753 (1948), the allegations made by the prisoner were "ill health, a desire for medical treatment, inability to obtain proper treatment in the Penitentiary, failure or refusal of the prison authorities to deliver mail to him or to mail communications from him." In *State ex rel. Baldwin v. Superintendent,* 192 Md. 712, 63 A. 2d 323 (1949), the prisoner claimed he had tuberculosis but was denied proper treatment in the prison hospital by the doctor in charge and by the attendants, that proper food was lacking and that his complaints to the Superintendent had been ignored. In *Edmondson v. Warden,* 194 Md. 707, 69 A. 2d 919 (1949), the prisoner requested the writ "to inquire into the legality" of the warden's "not letting him write" to a named person "to get information on the writ of error *coram nobis.*" In *State ex rel. Arnold v. Warden,* 195 Md. 700, 72 A. 2d 700 (1950), the complaint was that the prisoner was kept in solitary confinement and was denied the right to attend church and thus his right to worship God by the arbitrary action of the warden. In *Warfield v. Raymond,* 195 Md. 711, 71 A. 2d 870 (1950), the prisoner complained about the lack of medical treatment, and the quality of the food. He further asserted that the Superintendent of the institution in which he was incarcerated had on previous occasions refused to forward petitions or restricted their size or content. The petitioner in *Holliday v. Warden,* 198 Md. 651, 80 A. 2d 608 (1951), asserted that he was not able to use his own money to sup-

port himself in the penitentiary or to write his family for support and that his important letters and applications for writs had been held up by the prison authorities. In *Hirons v. Warden,* 198 Md. 662, 80 A. 2d 608 (1951), *Bell v. Warden,* 207 Md. 618, 113 A. 2d 482 (1955), and *Clay v. Warden,* 207 Md. 631, 114 A. 2d 893 (1955), the question was the propriety of a transfer by the Superintendent of Prisons from one penal institution to another. In *Randall v. Warden,* 213 Md. 653, 132 A. 2d 576 (1957), we emphasized the consistency of our position. "We have repeatedly held that complaints as to prison management cannot be considered on *habeas corpus.*" At 654.[17] The rationale of our holding is patent. Such matters are properly the responsibility of the executive branch of government. Time and again we pointed out that those types of complaints should be made to the proper executive authority.[18] "Complaints as to need for medical treatment

---

17. This is in accord with the statutory intent. A person detained from his lawful liberty may complain to the court having jurisdiction and power to grant the writ of habeas corpus "to the end that the cause of such * * * detainer * * * may be inquired into * * *." Code, Art. 42, § 3. Upon inquiry on the return of the writ, the detainer shall be released or discharged "* * * if it shall appear that such person is detained without legal warrant or authority * * *." Id., § 14.

In the instant case, the court below did not feel petitioners were entitled to be released. It said in the opinion of 11 November 1971:

"It is the Court's opinion that the petitions for Writs of Habeas Corpus cannot be granted for the outright release of the petitioners in this case. Courts have not yet reached that day when prisons and facilities such as the Patuxent Institution can be declared invalid under the Eighth Amendment as being cruel and unusual. Even in a maturing society, we have not reached that period in the evolving standards of prison reform where lack of rehabilitative services, lack of trained and concerned personnel, or lack of treatment amounts to cruel and unusual punishment calling for outright release under the law as it exists today.

That day has not arrived. *Sas v. Maryland,* 334 F. 2d 506, a long and exhaustive opinion, decided that the concept of Patuxent Institution and its general method of treatment was constitutional and the Court is bound by that decision and the decisions of the Maryland Court of Appeals to the effect that Article 31B of the Annotated Code of Maryland, is constitutional on its face."

18. Ch. 401, Acts 1970 repealed former § 204 of Art. 41, creating the Department of Correction, and enacted present § 204 establishing the Department of Public Safety and Correctional Ser-

should be made to the Board of Correction." *Jacobs,* at 756. Such complaints "should be addressed to the Board of Correction which is responsible for proper prison management." *Baldwin,* at 713. "The Board of Correction has full power and control over the House of Correction. * * * Such complaints should be made to the Board of Correction. It cannot be assumed that the Board will abuse or has abused its powers." *Edmondson,* at 708. "If a prisoner serving a sentence in the Maryland Penitentiary is maltreated by the warden or other officials or employees of the institution, his remedy is to apply to the Board of Correction of the State, where his complaint will be heard, and if sustained, corrected." *Arnold,* at 701. "The Board of Correction has full power and control over the Maryland Penitentiary. * * * Such complaints should be made to the Board of Correction. The Court of Appeals cannot assume that the Board has abused its powers." *Holliday,* at 651-652. We made a similar statement in *Krebs v. Warden,* 199 Md. 688, 690, 86 A. 2d 402 (1952). On several occasions we added a word of caution. "Of course, prison authorities must not in any way prevent freedom of communication with the courts, with executive authorities or with counsel." *Jacobs,* at 757. "The petitioner has an absolute right to communicate with the courts, without interference by the prison authorities * * *." *Warfield,* at 713. That these warnings were directed to the Board of Correction seems clear. We indicated no sanction for failure to heed them.

The advent of the Uniform Post Conviction Procedure Act, ch. 44, Acts 1958, brought no change in the declared philosophy. The Act established no new means for seeking redress for alleged wrongs to persons while lawfully incarcerated. It empowered prisoners and defective delinquents to institute a collateral proceeding to set aside a sentence upon claim that the sentence or judg-

---

vices. For statutory provisions with regard to the Department of Correction see § 667 et seq. of Art. 27 as in effect prior to amendment by ch. 401, Acts 1970.

ment was in violation of the federal constitution or the constitution or laws of Maryland, or that the court was without jurisdiction to impose sentence, or that the sentence exceeded the maximum authorized by law, or that the sentence was "otherwise subject to collateral attack upon any ground of alleged error which would otherwise be available under a writ of habeas corpus, writ of coram nobis, or the common-law or statutory remedy." Code, Art. 27, § 645A (a).[19] So in *Knox v. Director,* 1 Md. App. 678, 232 A. 2d 824 (1967), when a detainee at Patuxent sought leave to appeal from a denial of relief prayed in a petition under post conviction procedures in which he alleged that he was "being denied his Fifth Amendment privilege against self-incrimination by the Director at Patuxent Institution" and was "being denied his right to counsel while at Patuxent for examination", the Court of Special Appeals denied the application for the reason that such contentions were not cognizable under the Uniform Post Conviction Procedure Act because they did not "either directly or indirectly, challenge the legality of applicant's judgment of conviction." At 680. In *Creswell v. Director,* 2 Md. App. 142, 233 A. 2d 375 (1967), that Court held that a complaint by a defective delinquent that, as applied to him, Patuxent did not "in fact furnish treatment which supports the Act under the equal protection clause of the Fourteenth Amendment," was not properly cognizable under the Act. At 143-144. In *Robinson v. Director,* 3 Md. App. 222, 238 A. 2d 124 (1968), it held that a contention that a Patuxent detainee was "not then taking treatment at Patuxent" may not be raised in a post conviction proceeding. At 224.

We observe that the Defective Delinquents Act, Code, Art. 31B, provides no procedure for judicial review of grievances made by detainees lawfully confined in Patuxent. The powers conferred by it upon the courts concern

---

19. Section 645A (e) limited the right of appeal formerly enjoyed in habeas corpus cases, thus explaining the virtual disappearance of such cases from our reported opinions after the passage of the Act.

determination and redetermination of defective delinquency *vel non* and means of appeal therefrom, §§ 6-11A. So in *Barnes v. Director,* 227 Md. 641, 643, 175 A. 2d 20 (1961), we held that whether an inmate of Patuxent had been "denied proper medical treatment at Patuxent, is irrelevant to any cogent issue involved in a redetermination hearing." We again so held in disposing of a claim of denial of proper medical treatment in *Tippett v. Director,* 233 Md. 647, 648, 197 A. 2d 257 (1964), and in answering a claim of a Patuxent detainee that he had not received psychiatric treatment or therapy since his incarceration, in *Dickerson v. Director,* 235 Md. 668, 670-671, 202 A. 2d 765 (1964). In the isolated cases in which the matter of medical treatment at Patuxent has been considered, see *Robinson v. Director, supra,* it has been with regard to the propriety in the constitutional sense of the treatment afforded inmates in that Institution as fulfilling the purpose contemplated by the Act. *Daniels v. Director,* 238 Md. 80, 206 A. 2d 726 (1965) ; *Alt v. Director,* 240 Md. 262, 213 A. 2d 746 (1965). The Act in that context has been held to be constitutional on its face and in its interpretation, application, administration and results. *Director v. Daniels,* 243 Md. 16, 221 A. 2d 397 (1966).

The short of it is that in this State the courts have steadfastly refused to review the complaints of persons confined in Patuxent and the various penal institutions, for the reason that the redress of grievances of the inmates was for the executive branch of the government.

## V

The Maryland courts have not been alone in their reluctance to review the decisions and actions of prison administrators. A dogma labelled the "hands-off doctrine" [20] was established and followed as the unanimous

---

20. So called in Fritch, *Civil Rights of Federal Prison Inmates* 31 (1961), a document prepared for the Federal Bureau of Prisons. For discussions of the doctrine see Symposium Comment, *Incarcerating the Innocent: Pretrial Detention in our Nation's*

precedent of a number of courts that "courts are without power to supervise prison administration or to interfere with the ordinary prison rules or regulations." *Banning v. Looney*, 213 F. 2d 771 (10th cir. 1954), *cert. denied*, 348 U. S. 859 (1954). The position of those courts was flatly stated: "We think that it is well settled that it is not the function of the courts to superintend the treatment and discipline of prisoners in penitentiaries, but only to deliver from imprisonment those who are illegally confined." *Stroud v. Swope*, 187 F. 2d 850, 851-852 (9th cir. 1951), *cert. denied*, 342 U. S. 829 (1951). The doctrine was justified by reference to the principle of separation of powers, the administration of prisons being deemed to be exclusively within the jurisdiction of the executive branch. It was felt that since penal institutions were administered under authority of the executive branch of government, the judicial branch should not interfere. See *Powell v. Hunter*, 172 F. 2d 330 (10th cir. 1949). Another rationalization for noninvolvement by a court was its lack of expertise in penology with the fears that judicial intervention would subvert prison discipline and undermine the authority of prison officials. *Gray v. Creamer*, 329 F. Supp. 418 (W.D. Pa. 1971). And when federal courts were faced with complaints from state prisoners another reason for adhering to the hands-off doctrine was interposed—the principle of federalism proscribing federal intervention in matters solely the concern of the state. See *United States ex rel. Atterbury v. Ragen*, 237 F. 2d 953 (7th cir. 1956) *cert. denied*, 353 U. S. 964 (1957). The uniformity with which the hands-off doctrine was followed by both federal and state courts is readily apparent from the expansive list of

*Jails*, 21 Buffalo Law Review 891 (1972); Symposium Comment, *Prisoner's Rights and the Correctional Scheme: The Legal Controversy and Problems of Implementation*, 16 Villanova Law Review 1029 (1971); Note, *Judicial Intervention in Prison Administration*, 9 William and Mary Law Review 178 (1967). Much of what follows herein with regard to the hands-off doctrine has been culled therefrom and from Note, *Beyond the Ken of Courts: A Critique of Judicial Refusal to Review Complaints of Convicts*, 72 Yale L. J. 506 (1963).

cases cited in footnote 12 of the Note in 72 Yale L. J., *supra*, at 508.[21]

## VI

In deciding the cases which have come before us involving the treatment of incarcerated persons, we have never determined them in the frame of reference of the constitutional rights of the individual. Before we can assess our position it is necessary that we consider such rights as they relate to a person lawfully detained at Patuxent. As pointed out herein in quoting *Director v. Daniels,* 243 Md. at 38, we have found from the legislative history of the Defective Delinquents Act that "The legislative imposition of sanctions by restraining the individual results from studies that indicate that such restraint is necessary both for the protection of society and to provide medical treatment to further curative measure." Such restraint of a person does not mean that he is stripped bare of his rights.[22] But certain depriva-

---

21. The doctrine was not without criticism. The Note quotes George Bernard Shaw's comment when reviewing the book of Sidney and Beatrice Webb on English prisons:

"Judges spend their lives in consigning their fellow creatures to prison; and when some whisper reaches them that prisons are horribly cruel and destructive places, and that no creature fit to live should be sent there, they only remark calmly that prisons are not meant to be comfortable; which is no doubt the consideration that reconciled Pontius Pilate to the practice of crucifixtion." G. B. Shaw, *The Crime of Imprisonment* 14 (1946), published as a preface to S. & B. Webb, *English Prisons under Local Government* (1922).

22. It was not always so considered. The Virginia Supreme Court of Appeals in *Ruffin v. Commonwealth,* 62 Va. (21 Gratt.) 790 (1871), noted that one of the declarations in Virginia's bill of rights was "that government is instituted for the common benefit, protection and security of the people." It said, at 795-796:

"Now one of the most effectual means of promoting the common benefit and ensuring the protection and security of the people, is the certain punishment and prevention of crime. It is essential to the safety of society, that those who violate its criminal laws should suffer punishment. A convicted felon, whom the law in its humanity punishes by confinement in the penitentiary instead of with death, is subject while undergoing that punishment, to all the laws which the Legislature in its wisdom may enact for the government of that institution and the control of its inmates. For the time being, during his term of service

tions are a necessary and expected result of being an inmate of Patuxent. "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U. S. 266, 285, 68 S. Ct. 1049, 92 L. Ed. 1356 (1948). "Imprisoned felons and inmates of such institutions as Patuxent cannot enjoy many of the liberties, the rights and the privileges of free men. They cannot go abroad or mount the housetops to speak. They are subjected to rigid physical limitations and to disciplinary controls which would find no shred of justification in any other context. Even the disciplinary powers of military authorities are not so absolute." *McCloskey v. Maryland,* 337 F. 2d 72, at 74 (4th cir. 1964).[23] While the rights of an inmate of Patuxent may be restricted as justified to achieve the purpose of the Defective Delinquents Act, they are by no means abolished. The statement of the United States Court of Appeals for the Sixth Circuit, per curiam, in

---

in the penitentiary, he is in a state of penal servitude to the State. He has, as a consequence of his crime, not only forfeited his liberty, but all his personal rights except those which the law in its humanity accords to him. He is for the time being the slave of the State. He is *civiliter mortuus;* and his estate, if he has any, is administered like that of a dead man.

The bill of rights is a declaration of general principles to govern a society of freemen, and not of convicted felons and men civilly dead. Such men have some rights it is true, such as the law in its benignity accords to them, but not the rights of freemen. They are the slaves of the State undergoing punishment for heinous crimes committed against the laws of the land. While in this state of penal servitude, they must be subject to the regulations of the institution of which they are inmates, and the laws of the State to whom their service is due in expiation of their crimes."

23. See *Collins v. Schoonfield,* 344 F. Supp. 257 (D. Md. 1972), for a discussion of the curtailment of constitutional rights of persons detained while awaiting trial upon accusation of a criminal offense and of persons incarcerated in a penal institution upon conviction. See also *Stewart v. State,* 1 Md. App. 309, 229 A. 2d 727 (1967); *Smith v. State,* 1 Md. App. 297, 229 A. 2d 723 (1967). "Mere confinement restricts freedom of movement. Confinement in an institution which must provide for the custody, maintenance, discipline, and rehabilitation of men who have violated legislative norms involves still greater forfeitures." Note, 72 Yale L. J. *supra,* at 506-507.

*Coffin v. Reichard,* 143 F. 2d 443, 445 (1944), is now widely quoted:

> "A prisoner retains all the rights of an ordinary citizen except those expressly, or by necessary implication, taken from him by law. While the law does take his liberty and imposes a duty of servitude and observance of discipline for his regulation and that of other prisoners, it does not deny his right to personal security against unlawful invasion."

Until the defective delinquent has improved under psychiatric supervision so that he .can be legally released as no longer a danger to himself or society, he is subject to such restraint as is necessary for his lawful confinement, and as is essential to the furtherance of the purpose of such confinement. Such constitutional rights as follow him into Patuxent are properly to be tempered to this end.

## VII

If the only invasion of the rights of a Patuxent detainee were those arising as an inevitable concomitant of the institutional structure and purpose, there would be no problem. The court found in *McCloskey v. Maryland, supra,* at 74: "In the great mass of instances * * * the necessity for effective disciplinary controls is so impelling that judicial review of them is highly impractical and wholly unwarranted." However, we do not close our eyes to the fact that an inmate may suffer deprivations which are not a necessary result of his lawful confinement but rather are attributable to arbitrary and capricious decisions by officials or to unduly restrictive regulations. The question is what redress should be provided.

In many jurisdictions today the hands-off doctrine is being eroded. This has come about with the intensified awareness of individual rights and the emphasis on protecting them. In effect, what courts in other jurisdictions

have done is to define the right of a prisoner to personal security against unlawful invasion in constitutional terms and accept judicial review to assure the right. This has been accomplished in some instances by a reversal of prior decisions ruling that relief did not lie in habeas corpus proceedings. So in *Commonwealth ex rel. Bryant v. Hendrick,* 444 Pa. 83, 280 A. 2d 110 (1971) the Supreme Court of Pennsylvania concluded that "a court should never deny habeas corpus out of hand in the face of a request for relief based on a patent and serious deprivation of a constitutional right, particularly where the aggrieved person is incarcerated in a state or federal institution." At 114. In *Levier v. Kansas,* 209 Kan. 442, 497 P. 2d 265 (1972), the Supreme Court of Kansas, finding that regulations prescribed by the state director of penal institutions with respect to inmate grievances were so vague and ambiguous as to be inadequate for their intended purpose, thought that habeas corpus provided an appropriate remedy for inquiry into mistreatment of a continuing or probably continuing nature alleged by an inmate of a penal institution. It said: "As a matter of elemental justice such rights as an inmate has should not be without an effective means of enforcement. In the absence of adequate administrative procedures inmates should not be denied reasonable access to the courts." At 271. The Supreme Court of South Carolina in *McLamore v. South Carolina,* 257 S. C. 413, 186 S.E.2d 250 (1972), although affirming a lower court holding that the petitioner there had not been denied a constitutional right, put its stamp of approval on a post conviction proceeding, brought as a class action, as the means to consider the constitutionality of confinement at hard labor on public works and the lack of educational and rehabilitative services to the petitioner which were available to other inmates of the Department of Correction.

In the federal courts the abrogation of the hands-off doctrine, as traced in the Symposium Comment in 21 Buffalo Law Review 891, began with the Supreme Court's ruling in *Monroe v. Pape,* 365 U. S. 167, 81 S. Ct. 473, 5

L.Ed.2d 492 (1961), that exhaustion of state remedies was not a condition precedent to a federal court's accepting jurisdiction under the federal Civil Rights Act of 1871, and was furthered by *Robinson v. California*, 370 U. S. 660, 82 S. Ct. 1417, 8 L.Ed.2d 758 (1962), which held that the eighth amendment did apply to the states through the fourteenth amendment. *Cooper v. Pate*, 378 U. S. 546, 84 S. Ct. 1733, 12 L.Ed.2d 1030 (1964), dispelled any remaining doubt that a prisoner in a state institution could bring an action in federal court under the Civil Rights Act.[24] In *McCloskey v. Maryland, supra,* the United States Court of Appeals for the Fourth Circuit affirmed an order of the United States District Court for the District of Maryland denying without a hearing a petition by a state prisoner for an order requiring state prison officials to permit him to engage in extensive correspondence. It recognized the executive authority over the conduct of prisons:

> "Because prison officials must be responsible for the security of the prison and the safety of its population, they must have a wide discretion in promulgating rules to govern the prison population and in imposing disciplinary sanctions for their violation. * * * The remedy of the inmate is through administrative review, which ought to be available always."

Significantly, however, it noted:

> "If a tractable inmate is subjected to cruel and unusual punishment or if his exercise of a constitutional right is denied without semblance of justification arising out of the necessity to preserve order and discipline within the prison,

---

24. For comprehensive discussions with state and federal citations of the trend toward judicial review of prisoners' rights, see, in addition to the articles mentioned in note 20 herein, Goldfarb and Singer, *Redressing Prisoners' Grievances*, 39 Geo. Wash. L. Rev. 175 (1970); Notes, 19 Kan. L. Rev. 139 (1970); Sneidman, *Prisoners and Medical Treatment: Their Rights and Remedies*, 4 Crim. L. Bull. 450 (1968).

he may have a right of judicial review." 337
F. 2d at 74.

As authority, it cited its opinions in *Sewell v. Pegelow*,
291 F. 2d 196 (1961) ; *Roberts v. Pegelow*, 313 F. 2d 548
(1963) ; *Childs v. Pegelow*, 321 F. 2d 487 (1963). In
*Hayes v. Secretary of Department of Public Safety*, 455
F. 2d 798 (1972), the United States Court of Appeals
for the Fourth Circuit afforded a judicial review. It re-
versed the judgment of the United States District Court
for the District of Maryland which dismissed as frivo-
lous, without requiring an answer an action by an in-
mate of Patuxent based on acts of alleged misconduct
on the part of the custodial force.[25] The appellate court
held that the plaintiff was "injured", was a member of a
class which was "injured", and was thus competent to
maintain a class action for himself and others similarly
situated. The case was remanded with direction to the
lower court to appoint counsel to represent him and to
have an amended complaint filed within a reasonable
time before a responsive pleading was required.[26]

We see no need now for a departure from our prior
opinions. Chief Justice Warren E. Burger said in an ad-
dress to the National Association of Attorneys General
at Washington, D. C. on 6 February 1970:

"We need not and should not abandon or even
modify habeas corpus. What we need is to sup-
plement it with flexible, sensible working mech-
anisms adapted to the modern condition of

---

**25.** The misconduct alleged included "beating a named inmate,
using mace and practicing brutality on other named inmates, with-
holding food from inmates because they protested, stealing food
of inmates, beating and chaining two other inmates for miscon-
duct and failing to provide medical treatment to inmates who
were ill." 455 F. 2d at 799.

**26.** On remand the District Court in a memorandum opinion
and order dismissed as moot the petition for the reasons that
Hayes had been released from Patuxent and was "therefore, not
subject to the situation, actually or potentially, that he alleges
exists, and has not claimed any damages or that he has in fact
been injured or prejudiced in any way." *Hayes v. Secretary of
Department of Public Safety*, Civil Action No. 71-210-w, filed 27
October 1972.

> overcrowded and understaffed prisons . . . a simple and workable procedure by which every person in confinement who has, or who thinks he has, a grievance or complaint can be heard promptly, fairly and fully."

Maryland now has such a flexible, sensible working mechanism. By ch. 210, Acts 1971, effective 1 July 1971 and codified as Art. 41, § 204 F, the Inmate Grievance Commission was established as a separate agency within the Department of Public Safety and Correctional Services. The Act enables "any person confined to an institution within the Division of Correction, or otherwise in the custody of the Commissioner of Correction, or confined to the Patuxent Institution" to submit such grievance or complaint he may have "against any officials or employees of the Division of Correction or the Patuxent Institution." Subsection (d). If on preliminary review the Commission finds the complaint "to be on its face wholly lacking in merit," it may be dismissed. The order of dismissal shall promptly be forwarded to the complainant and shall constitute the final decision for purposes of judicial review. Subsection (e). If on such review the complaint is not found on its face to be wholly lacking in merit, "the Commission shall as promptly as practicable hold a hearing" thereon. Subsection (f). The inmates shall have the right to appear before the Commission at a hearing, shall have the opportunity to call a reasonable number of witnesses, and shall have a reasonable opportunity to question any witness testifying. "Such rights of the inmate shall not be unreasonably withheld or restricted by the Commission." Subsection (h). An inmate shall be permitted to be represented by an attorney of his own choosing at his own expense. *Ibid.* The Commission, with the approval of the Secretary of Public Safety and Correctional Services, shall have access to any documentary evidence of any person or institution being investigated or proceeded against. It "may require by subpoena the attendance and testimony of witnesses and the production of all documentary evidence of any person relat-

ing to any matter under investigation." Subsection (g). A record shall be kept and open to public inspection of all complaints and their disposition. Subsection (i).

A record of the testimony presented at the hearing may be kept and the decision shall be issued in the form of an order "which shall include a statement of the findings of fact, the Commission's conclusions and its disposition of the complaint." Subsection (f). The types of disposition are spelled out in that subsection:

> "(1) If after the hearing, the Commission finds in its order that the complaint is wholly lacking in merit and should be dismissed, such an order of dismissal shall be promptly forwarded to the complainant and shall constitute the final decision of the Secretary of Public Safety and Correctional Services for purposes of any judicial review.
>
> (2) However, if after the hearing, the Commission in its order finds that the inmate's complaint was in whole or in part meritorious, such order shall be promptly forwarded to the Secretary of Public Safety and Correctional Services. Within fifteen days of the receipt of such an order, the Secretary by order shall affirm the order of the Commission, or shall reverse or modify the order where he disagrees with the findings and conclusions of the Commission. The Secretary shall order that the appropriate official of the institution in question accept in whole or in part the recommendation of the Commission or the Secretary may take whatever action he deems appropriate in light of the Commission's findings. The order of the Secretary shall be promptly forwarded to the complainant, and the Secretary's order shall constitute the final decision for purposes of judicial review."

The Act effectively abrogates the hands-off doctrine by providing for judicial review. Subsection (1). The com-

plainant shall be entitled to a judicial review of the final decision of the Secretary of Public Safety and Correctional Services upon exhaustion of the remedies provided in the Act. Proceedings for review shall be instituted in the circuit court of the county in which is located the institution where the complainant is confined or in the Baltimore City Court when such institution is located in Baltimore City. The review shall be on the record before the Commission and "shall be limited to a determination of whether there was a violation of any right of the inmate protected by federal or State laws or constitutional requirements."

We think that the Inmate Grievance Commission Act and the implementing rules adopted by the Commission provide "a simple and workable procedure by which every person in confinement who has, or thinks he has, a grievance or complaint can be heard promptly, fairly, and fully," and obtain a judicial review with respect to his constitutional and statutory rights.[27]

---

27. Commission Rule 12.07.00.05 (2) provides: "Within thirty (30) days of the final decision of the Secretary of Public Safety and Correctional Services, the complainant shall be entitled to judicial review thereof." See Code, Art. 41, § 204F (1).

In *Hayes v. Secretary of Department of Public Safety, supra,* the court said, at 800:

"While Maryland has recently established an Inmate Grievance Commission, Ann. Code of Md., Art. 41, § 204F (1971 Supp.), to determine and recommend the proper redress for meritorious grievances of inmates of Patuxent and other correctional institutions, we take judicial notice of the fact that the Commission is not yet fully operative. When it is, there will be time enough for the Supreme Court to determine if *Monroe v. Pape,* and, we, our own decisions, should be re-examined. That time is not the present."

We take judicial notice that the Commission is now fully operative. It began operation upon the appointment of an executive director on 30 November 1971. Rules and Regulations implementing Code, Art. 41, § 204F were adopted. Public Safety and Correctional Services, 12.07.00.00—12.07.00.05. The first hearing session was held on 17 December 1971 and hearings have been held continually since that time. Almost 600 complaints have been received from inmates and about 100 orders issued. The complaints and the disposition of them are open to public inspection pursuant to Code, Art. 41, § 204F (i).

## VIII

We now review the case before us in the light of what we have discussed.

We do not have before us any question as to the two hundred and some rules and regulations now in effect with the apparent blessing of all parties. How they came into being is not now material. Whether the orders of the court below to draft them and adopt them were proper or not, they were ultimately made and adopted within the statutory requirements and, it seems, are in effect. They are not challenged and they stand intact.

We have before us that part of the order of 24 February 1972 which commanded appellants to file new rules and regulations in the six disputed areas. The order made clear that these rules must be in substance the same as those covering the subjects appended to the order filed 18 November 1971. Appellants noted an appeal on 17 March 1972 and perfected it. At that point such jurisdiction as the lower court had over the case ended. "[T]he law is well settled that ordinarily, the trial court's jurisdiction is ended upon the filing of an appeal to this Court." *Stacy v. Burke, supra,* at 401. "[W]hen an appeal is taken, it does affect the operation or execution of the order, judgment or decree from which the appeal is taken, and any matters embraced therein. After the appeal has been perfected, this Court is vested with the exclusive power and jurisdiction over the subject matter of the proceedings, and the authority and control of the lower court with reference thereto are suspended." *Bullock v. Director,* 231 Md. 629, 633, 190 A. 2d 789 (1963). See supporting authorities set out in note 3 thereof. Therefore, the order of the lower court of 26 April 1972, by which it accepted and adopted *nunc pro tunc* as of 24 February 1972, rules and regulations in the disputed areas in the form required by it but protested by appellants, and commanded that they be implemented within a reasonable time and that they be transmitted to this Court for inclusion in the record on appeal was null and void. This leaves before us, with respect to the dis-

puted matters, the rules and regulations as appended to the order of 24 February 1972 and which the lower court found insufficient.[28] We adhere to our prior opinions. Thus, insofar as the order of 24 February attempted to grant relief requested by the petitions for a writ of habeas corpus, the court, having found that the petitioners were not entitled to be released or discharged from confinement, should have denied the petitions. With respect to the declaratory and injunctive relief sought, we believe that redress for the complaints as to censorship were not properly within the ambit of a declaratory or injunctive proceeding, even if it be deemed that the lower court was attempting to act under such proceedings. In the light of the passage of the Inmate Grievance Commission Act we find it to have been the legislative intent that prisoners' grievances, even when involving constitutional rights, were not to be the subject of Code, Art. 31A or Rules BB70-BB80. We hold that the lower court erred in the entry of the order of 24 February 1972. We reverse it. The result is that the lower court may not compel appellants to make and adopt new rules relating to the six areas in dispute, nor, of course, may it retain jurisdiction of the case. The rules and regulations as made and adopted by the Board of Patuxent Institution and approved by the Secretary of Public Safety and Correctional Services as of 28 April 1972 stand in full force and effect. If an inmate of Patuxent is aggrieved by them, he may make his complaint to the Inmate Grievance Commission and pursue the remedies available to him through a judicial determination of whether there is a violation of any of his rights protected by federal or State laws or constitutional requirements.

Even though, as we have indicated, the trial court had no jurisdiction in the matters presented to it, the agreement of the parties produced comprehensive rules and regulations, resulting, as appears in the record be-

---

28. We are informed they were adopted by the Board and approved by the Secretary on 28 April 1972. They appear in the "Patuxent Patient Handbook."

fore us, from conferences participated in by representatives of the Patuxent authorities and Patuxent inmates, and, in the main, presenting a concurrence of their thoughts.

*Order of 24 February 1972 reversed.*

## APPENDIX A

The Circuit Court for Montgomery County

| Petition No. | Caption | Case Name |
|---|---|---|
| 4363 | Habeas Corpus | Milton McCray, Leon Height, James Carter, The Black Hawks v. Patuxent Institution |
| 4411 | Ex Parte Injunction | Gilbert R. X. Hall v. State of Maryland |
| 4416 | Ex Parte Injunction | Hugh Maurice Wade v. State of Maryland |
| 4417 | Ex Parte Injunction | Quentin A. Whaley v. State of Maryland |
| 4418 | Ex Parte Injunction | William Andrews v. State of Maryland |
| 4419 | Ex Parte Injunction | Lascell X. Gallop v. State of Maryland |
| 4420 | Ex Parte Injunction | John X. Ingram, Walter E. X. Jones, Hugh M. Wade, George A. X. Wells, III, Charles R. Dorsey, Quentin Whaley, Lascell X. Gallop, Alexander Bannerman, James E. Carter, Gilbert R. X. Hall v. State of Maryland |
| 4423 | Habeas Corpus | George A. X. Wells, III v. Director, Patuxent Institution, Harold M. Boslow |
| 4424 | Ex Parte Injunction | Hugh M. A. Wade v. State of Maryland |
| 4425 | Habeas Corpus | James Edward Carter, Jr. v. Harold Boslow, Director, Patuxent Institution |
| 4426 | Ex Parte Injunction | Charles M. Dorsey v. Director, Patuxent Institution |

| Petition No. | Caption | Case Name |
|---|---|---|
| 4427 | Ex Parte Injunction | Walter E. X. Jones v. State of Maryland |
| 4428 | Ex Parte Injunction | John X. Ingram v. State of Maryland |
| 4429 | Ex Parte Injunction | James Edward Carter v. State of Maryland |
| 4430 | Ex Parte Injunction | Alexander B a n n e r m a n v. State of Maryland |

## The Circuit Court for Howard County

| Petition No. | Caption | Case Name |
|---|---|---|
| A5079 | Habeas Corpus | Lewis Mitchell v. Patuxent Institution |
| A5107 | Habeas Corpus | Milton McCray v. State of Maryland |
| A5108 | Habeas Corpus | John Miller, Milton McCray and Leon Height v. State of Maryland |
| A5139 | Habeas Corpus | Gilbert R. X. Hall v. Harold M. Boslow, et al |
| A5319 | Habeas Corpus | Hugh M. Wade v. Robert Lalley, Secretary of Public Safety and Correctional Services |
| A5363 | Habeas Corpus | E u g e n e Grove, Hugh M. Wade, Quentin Whaley, Lascell Gallop, Charles Dorsey, George Wells, James Carter, Walter Jones and Gilbert R. X. Hall v. Dr. Harold M. Boslow |