703 A.2d 167

MARYLAND HOUSE OF CORRECTION

v.

Merrill FIELDS.

SECRETARY OF PUBLIC SAFETY AND
CORRECTIONAL SERVICES

v.

Wayne HOOD.

Earl D. BESHEARS, Warden

v.

Michael S. SAYKO.

Nos. 125, 126, Sept. Term, 1996 and 19, Sept. Term, 1997.

Court of Appeals of Maryland.

Dec. 15, 1997.

Richard B. Rosenblatt, Alan D. Eason, Asst. Attys. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), Baltimore, for Petitioners.

Jeffery C. Taylor, Baltimore, Amicus Curiae–argued by Stephen Z. Meehan, Deputy Principal Counsel; (David C. Wright, Principal Counsel; Joseph B. Tetrault, Staff Atty., Prisoner Rights Information System of Maryland, Inc., all on brief), Chestertown, for Respondent Merrill Fields.

Stephen Z. Meehan, Deputy Principal Counsel; (David C. Wright, Principal Counsel; Joseph B. Tetrault, Staff Atty., Prisoner Rights Information System of Maryland, Inc., all on brief), Chestertown, for Respondents Wayne Hood and Michael S. Sayko.

Argued before BELL, C.J., ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI * and RAKER, JJ., and MARVIN H. SMITH, J. (Retired and Specially Assigned).

CHASANOW, Judge.

In this certiorari review of three decisions of the Court of Special Appeals, we must address the following questions:

1. Whether the failure of an inmate to raise an issue in an inmate grievance proceeding operates as a procedural bar to habeas corpus review of that issue;

2. Whether the Division of Correction (Division) awarded habeas corpus plaintiffs the proper number of diminution credits in light of a 1992 amendment to Maryland Code (1957, 1992 Repl.Vol.), Article 27, § 700(d)(3) that increased the rate of accumulation of diminution credits from five days per month to ten days per month; and

3. Whether the Division possesses the authority to reduce an inmate's diminution credits by the amount of "street-time credits" awarded by the Maryland Parole Commission upon an inmate's return to incarceration for violation of mandatory supervision.

The following cases have been consolidated on appeal from the Court of Special Appeals: *Maryland House of Correction v. Fields* (No. 125), *Secretary, Department of Public Safety and Correctional Services v. Hood* (No. 126), and *Earl D. Beshears, Warden v. Sayko* (No. 19).[1] We begin with a summary of the pertinent facts of each case.

---

* Karwacki, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, § 3A, he also participated in the decision and the adoption of this opinion.

1. The Petitioners actually named are different here because inmates are required to direct their petitions for habeas corpus to the "person having custody of the individual confined or restrained." Maryland Rule 15–305. We, however, shall refer to Petitioners collectively throughout this opinion as "Division of Correction" or "Division" because the Division of Correction was the unit of the Department of Public Safety and Correctional Services responsible for calculating the contested credits with respect to all three habeas corpus plaintiffs.

## FACTUAL BACKGROUND

### I.

#### A. Fields

On April 19, 1988, Merrill Fields[2] was sentenced to ten years imprisonment, with all but five years suspended, for a daytime housebreaking conviction. Shortly thereafter, Fields received a two-year-consecutive sentence (less 86 days for time served) for violation of probation on a prior conviction of heroin possession. These two sentences combined to form a seven-year sentence (less 86 days).

Through the application of diminution credits to the sentences, Fields was released on mandatory supervision on May 8, 1992. Of these diminution credits, 401 credits were "good-conduct" credits, calculated at a rate of five days per month in accordance with former Md.Code (1957, 1992 Repl.Vol.), Art. 27, § 700(d)(2). In 1992, § 700 was amended to provide for ten days per month of good-conduct credits where the inmate has not been convicted of a crime of violence as defined by Md.Code (1957, 1996 Repl.Vol.), Art. 27, § 643B or certain drug related offenses.[3] Chapter 588 of the Acts of 1992 (now codified as Md.Code (1957, 1996 Repl.Vol., 1997 Supp.), Art. 27, § 700(d)(3)).

On February 2, 1994, less than two years after his release, Fields was convicted of theft and malicious destruction of property and given an eighteen-month sentence. These convictions violated his probation for an offense unrelated to the housebreaking and heroin convictions, for which he was given

---

2. We note that throughout the record Fields's first name is spelled in various ways, including Merrill, Merril, and Merrell. In one commitment record, a different last name is used, Sherrod.

3. A drug offense in this context is defined as "manufacturing, distributing, dispensing, or possessing a controlled dangerous substance as provided for under Article 27, § 286." Maryland Code (1957, 1996 Repl.Vol., 1997 Supp.), Article 27, § 700(d)(2). Fields's conviction for possession of heroin was not under § 286, but rather under § 287 and, thus, would not be deemed drug related in the context of this statute.

a consecutive six-month sentence. In addition, on May 17, 1994, the five-year sentence that had been suspended in connection with the earlier daytime housebreaking conviction was reimposed to be served concurrent with any outstanding or unserved sentences.

As a result of Fields's convictions for theft and malicious destruction of property, the Maryland Parole Commission (MPC) issued a warrant for Fields's return to custody, and a hearing was convened on May 3, 1994 to consider sanctions in relation to his failure to abide by the terms and conditions of his release on his original seven-year sentence. At this hearing, the MPC decided to revoke Fields's mandatory supervision release. As part of that decision, the MPC rescinded all good-conduct credits that had been acquired prior to Fields's release on mandatory supervision[4] and awarded Fields "street-time" credits[5] pursuant to Md.Code (1957, 1997 Repl. Vol., 1997 Supp.), Art. 41, § 511.[6]

To calculate the effect of the MPC's rescission of good-conduct credits and the award of street-time credits on the maximum expiration date of Fields's sentence, the Division subtracted the number of street-time credits from the number of diminution credits that Fields had earned during his initial confinement. *See* Division of Correction Commitment Procedure Manual, Ch. 90–134 (revised 9/15/95). This left a balance of 190 days, which was subtracted from the remainder of the

---

4. The parole commissioner has the power to revoke these previously earned diminution credits under Md.Code (1957, 1997 Repl.Vol., 1997 Supp.), Art. 41, § 4–612(e). *See also Frost v. State,* 336 Md. 125, 144, 647 A.2d 106, 115–16 (1994)(holding § 4–612(e), as applied, not violative of the constitutional prohibition against *ex post facto* laws).

5. Originally, Fields was awarded fifteen months of street-time credits. After Fields appealed the MPC's determination to the Circuit Court for Washington County, the circuit court remanded the case to the MPC with respect to how much street-time credit Fields should be granted and because a transcript of the revocation proceedings was unavailable. At that point, the MPC adjusted the number of credits to 641 credits.

6. Unless otherwise noted, all citations will be to the current version of the Maryland Code, which is substantively similar to the version in effect at the time of hearings before the MPC.

original seven-year sentence. The Division then awarded Fields new good-conduct credits for the reimposed five-year portion of the sentence that had been suspended on April 19, 1988 and the concurrent theft and malicious destruction of property convictions. These good-conduct credits were calculated at a rate of five days per month. The award of these credits resulted in a mandatory release date of August 11, 1997.

Dissatisfied with the manner in which the Division calculated the good-conduct credits, Fields filed a grievance with the Inmate Grievance Office (IGO) on March 13, 1995. Fields claimed that a 1992 amendment to Art. 27, § 700 increased the rate of accumulation of good-conduct credits from five days per month to ten days per month, and that the Division should have used the new rate in calculating his good-conduct credits. After a July 21, 1995 hearing on the matter, an Administrative Law Judge (ALJ) concluded that the grievance had merit. On November 16, 1995, the Secretary of Public Safety and Correctional Services (Secretary), however, rejected the ALJ's recommendation and denied the grievance based on its conclusion that an inmate who is serving multiple sentences is still only serving one "term of confinement" for the purposes of § 700 and the single term of confinement should be deemed " 'imposed' on the date that the sentence starting first within the term of confinement was imposed." Fields did not appeal this final order to the circuit court.

Fields instead filed a petition for a writ of habeas corpus in the Circuit Court for Baltimore City on November 27, 1995. In his petition, he presented two substantive arguments in support of his request for immediate release: (1) that good-conduct credits should have been awarded at a rate of ten days per month; and (2) that the Division should not have subtracted street-time credits from previously-earned diminution credits. The court agreed with Fields, granted habeas corpus relief, and ordered Fields be released on February 7, 1996. The Maryland House of Correction then noted an appeal to the Court of Special Appeals, which affirmed the decision of the circuit court. This Court granted the Mary-

land House of Correction's petition for writ of certiorari on February 14, 1997.

### B. Sayko

On July 30, 1987, Michael S. Sayko was sentenced to two, ten-year concurrent sentences for two cases of third-degree sexual offense. His sentences carried a maximum expiration date of February 13, 1997. Having earned 1203 diminution credits and having served all but 1203 days of his sentences, Sayko was conditionally released under mandatory supervision on October 29, 1993.

Almost a year and a half later, on March 29, 1995, Sayko was convicted of indecent exposure by the Circuit Court for Allegany County and was sentenced to three years imprisonment. Because the indecent exposure conviction constituted a violation of Sayko's conditional release, the MPC revoked Sayko's mandatory supervision at a hearing on May 4, 1995. *See* Art. 41, §§ 4–612(c), 4–511(c). As part of its decision to revoke the release, the MPC also rescinded approximately half of Sayko's previously-earned diminution credits pursuant to Art. 41, § 4–612(e). The MPC further granted Sayko street-time credit pursuant to § 4–511(d) for some, but not all, of the 521 days between the date Sayko was released on mandatory supervision and the date his release was revoked.[7]

As a result of the MPC's decision, the Division subtracted Sayko's street-time credits from Sayko's previously-earned diminution credits. From the remaining diminution credits, the Division deducted the diminution credits that the MPC had rescinded. According to the Division's calculations, Sayko was left with a total of 484 diminution credits. The Division also awarded Sayko additional good-conduct credits for the time Sayko spent in either a local jail or detention center and

---

7. Under Art. 41, § 4–511(d)(1), the MPC has the discretion to award an inmate street-time credit for the "time between release on [mandatory supervision] and revocation of [that mandatory supervision]." In the instant case, this is so despite the fact that, for some of the time between Sayko's release on mandatory supervision and its revocation, Sayko was incarcerated on the indecent exposure conviction.

prospective good-conduct credits for the time between Sayko's return to the Division's custody and his new maximum expiration date. These good-conduct credits were awarded at a rate of five days per month. The award of these credits resulted in a mandatory release date of April 2, 1996.

Sayko filed an amended petition for a writ of habeas corpus in the Circuit Court for Allegany County, arguing that he was entitled to immediate release. Sayko alleged that the Division illegally deducted his street-time credits from his diminution credits rather than adding the street-time credits to the diminution credits as the MPC intended. The circuit court agreed that the Division was without authority to make this deduction and, on January 17, 1996, the court ordered the Division to restore the credits. Sayko was immediately released under mandatory supervision.[8]

On appeal to the Court of Special Appeals, the Division raised two issues. First, the Division argued that Sayko should be barred from filing a habeas corpus petition because he had not exhausted his administrative remedies. Second, the Division argued that the circuit court erred in concluding that the Division erred in subtracting the street-time credits awarded Sayko by the MPC from his diminution credits. The intermediate appellate court, in an unreported opinion filed on December 17, 1996, affirmed the decision of the circuit court. This Court granted the Division's petition for writ of certiorari on April 11, 1997.

## C. Hood

On August 14, 1991, Wayne Hood was convicted of theft by the Circuit Court for Somerset County and was sentenced to eight years imprisonment, with all but four years suspended. The sentence commenced on August 11, 1991, and Hood was paroled on February 3, 1993. On December 22, 1993, Hood

---

8. Sayko also argued that the Division miscalculated his good-conduct credits, by crediting him with five rather than ten days per month. *See* Art. 27, § 700. The circuit court, however, denied Sayko's claim on this issue, and Sayko did not appeal the court's decision on the issue.

was again convicted of theft by the Circuit Court for Wicomico County and was sentenced to four years imprisonment, to begin on July 16, 1993. The December 1993 conviction constituted a violation of Hood's parole for the August 1991 sentence. Thus, on February 10, 1994, Hood appeared before the MPC for a hearing at which the MPC revoked Hood's parole pursuant to Art. 41, § 4–612(c). The MPC granted Hood street-time credits, however, for the period from February 3, 1993 to July 16, 1993, pursuant to Art. 41, § 511(d). On February 28, 1994, Hood was convicted of possession of a controlled dangerous substance and sentenced to nine months. On August 31, 1994, Hood appeared before the Circuit Court for Somerset County for a hearing on his violation of probation. At this time, the court reimposed the four years that were suspended in 1991 in conjunction with Hood's original theft conviction, to run consecutively to any of Hood's other sentences.

As a result of Hood's new sentences, the Division calculated Hood's new maximum expiration date as July 16, 2001, and it determined that Hood was entitled to five days of good-conduct credits per month until that date, a total of 569 credits. On May 18, 1995, Hood filed a grievance in the IGO arguing that the Division incorrectly calculated the number of good-conduct credits Hood was due. Hood argued that, pursuant to § 700, he was entitled to ten days of good-conduct credits per month on the sentence for the December 1993 theft conviction because the conviction occurred after Art. 27, § 700 was amended. The matter was referred to the Office of Administrative Hearings, and there was a hearing before an ALJ on August 16, 1995. On August 29, 1995, the ALJ determined that the grievance was without merit.

Hood sought judicial review in the Circuit Court for Somerset County which affirmed the decision of the ALJ on August 22, 1996. Hood then appealed to the Court of Special Appeals, which, in an unreported per curiam opinion filed on October 30, 1996, reversed the decision of the circuit court. The Court of Special Appeals held that, as to Hood's sentences imposed after October 1, 1992, Hood was entitled to good-conduct

credit at the rate of ten days per month. The court remanded the case to the circuit court with instructions to reverse and remand the decision of the Secretary for further proceedings consistent with its opinion. The Secretary filed a petition for writ of certiorari, and this Court granted certiorari on February 14, 1997.

## II.

Before turning to the two substantive issues presented, we must first address the procedural issue of whether plaintiffs'[9] use of petitions for writ of habeas corpus to secure judicial review of the Division's actions was proper. The Division contends that the circuit court lacked jurisdiction to consider the request for habeas corpus relief because plaintiffs failed to exhaust the administrative procedures established to redress inmate grievances. Plaintiffs claim that the resolution of the two substantive claims in their favor leaves them entitled to immediate release and, thus, plaintiffs may properly petition the court for writs of habeas corpus despite their failure to exhaust the inmate grievance procedure. We begin with a review of inmate grievance procedure and then proceed to a discussion of why, under the facts of the cases *sub judice*, an inmate need not use those procedures, but instead may file a petition for habeas corpus.

## A.

Article 41, § 4–102.1 establishes the Inmate Grievance Office and spells out the procedure for filing an inmate grievance. Generally, pursuant to subsection (c), individuals who are confined to correctional facilities must submit any complaints or grievances against any officials or employees of the Division to the IGO, which conducts a preliminary evaluation of the grievance. Art. 41, § 4–102.1(c) & (d). If the IGO

---

9. The following discussion regarding the use of a petition for writ of habeas corpus is applicable only to Fields and Sayko. Hood exhausted the administrative procedure set forth in Md.Code (1957, 1997 Repl. Vol.), Art. 41, § 4–102.1.

finds the grievance wholly lacking in merit, it may issue an order of dismissal without a hearing or findings of fact. Art. 41, § 4–102.1(d). That order constitutes the "final decision of the Secretary of Public Safety and Correctional Services for purposes of any judicial review." *Id.* If, on the other hand, the grievance is not found to be wholly lacking in merit, it is forwarded to the Office of Administrative Hearings (OAH), which conducts a hearing on the matter and acts upon its finding in a fashion similar to the IGO. Art. 41, § 4–102.1(e). If the hearing results in a finding by OAH that the grievance is wholly lacking in merit, an order of dismissal shall be issued, and such order constitutes the final decision of the Secretary. Art. 41, § 4–102.1(e). If, however, OAH concludes that the grievance is meritorious, either in whole or in part, OAH must promptly forward the grievance to the Secretary for review. *Id.*

The Secretary has fifteen days to affirm, reverse, or modify the order. *Id.* The Secretary must then order the appropriate officials to accept, in whole or in part, OAH's recommendations or the Secretary may "take whatever action he deems appropriate in light of the findings of" OAH. *Id.* The order of the Secretary constitutes a final decision for purposes of judicial review. *Id.* This Court has emphasized that the administrative remedy under the Inmate Grievance statute "is both comprehensive and 'flexible.'" *McCullough v. Wittner,* 314 Md. 602, 611, 552 A.2d 881, 885 (1989); *see also State v. McCray,* 267 Md. 111, 141–144, 297 A.2d 265, 281–84 (1972). *See generally* Comment, *Maryland Inmate Grievance Commission,* 35 MD. L. REV. 458 (1976).

The plaintiffs in the instant cases assert that the resolution of the two substantive claims in their favor leaves them entitled to immediate release, and thus, they could properly petition the circuit court for writs of habeas corpus despite any failure to invoke and exhaust the inmate grievance administrative and judicial review procedures.

The question posed is one of primary jurisdiction. Judge Rodowsky in *Wash. Sub. San. Comm'n v. Mitchell & Best,* 303

Md. 544, 561–62, 495 A.2d 30, 39 (1985) (quoting in part from *Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena*, 282 Md. 588, 601, 386 A.2d 1216, 1225–26 (1978)), stated for the Court:

"Primary jurisdiction 'is a judicially created rule designed to coordinate the allocation of functions between courts and administrative bodies.' The doctrine 'comes into play when a court and agency have concurrent jurisdiction over the same matter ... and there is no statutory provision to coordinate the work of the court with that of the agency.'" (Citations omitted).

In *Bd. of Ed. for Dorchester Co. v. Hubbard*, 305 Md. 774, 786, 506 A.2d 625, 631 (1986), after quoting the above passage from *Wash. Sub. San. Comm'n v. Mitchell & Best, supra*, we further explained as follows:

"In the situation outlined above, where the General Assembly has provided an administrative remedy and there also exists an independent judicial remedy, and no statute coordinates the two or specifies which is primary, we have ordinarily construed the pertinent enactments to require that the administrative remedy be first invoked and followed. *Sec. Dept. of [Human] Res. v. Wilson*, 286 Md. 639, 645, 409 A.2d 713, 717 (1979); *White v. Prince George's [Co.]*, 282 Md. 641, 649, 387 A.2d 260, 265 (1978), and cases there cited. On occasion, however, we have held that the administrative remedy is not primary and that resort may be had to the concurrent judicial remedy without invoking or exhausting the administrative procedures. *See, e.g., Md.–Nat'l Cap. P. & P. v. Wash. Nat'l Arena, supra.*

Where, however, the administrative remedy is deemed to be primary, this Court has generally held that it must be pursued and exhausted before a court exercises jurisdiction to decide the controversy."

■ Consequently, when the legislature provides an administrative and judicial review remedy for a particular matter, and where there is a pre-existing common-law or statutory judicial remedy for the same matter, and where the legislature fails to specify which remedy is primary, the usual legal

presumption is that the administrative remedy is primary and must be " 'first invoked and followed' before resort to the courts." *Md. Reclamation v. Harford Cty.,* 342 Md. 476, 493, 677 A.2d 567, 576 (1996)(quoting *Hubbard,* 305 Md. at 786, 506 A.2d at 631).

■ Moreover, if "the legislative body expressly states that the administrative remedy is primary . . . or must be exhausted, the mandatory nature of the exhaustion requirement is underscored. Such express language 'is totally inconsistent with the notion that the [administrative agency's] jurisdiction over [the matter] can be circumvented.' " *Md. Reclamation,* 342 Md. at 493, 677 A.2d at 576 (quoting in part from *McCullough,* 314 Md. at 609, 552 A.2d at 884).

The Inmate Grievance statute indicates that the administrative remedy shall be primary. Article 41, § 4–102.1(k) states in relevant part as follows:

> "No court shall entertain an inmate's grievance or complaint within the jurisdiction of the Inmate Grievance Office or the Office of Administrative Hearings unless and until the complainant has exhausted the remedies as provided in this section."

The Court in *McCullough,* 314 Md. at 608–09, 552 A.2d at 884, pointing to "[t]his sweeping language, delineating the need to invoke and exhaust the administrative remedy," held that, even if the administrative agency had lacked "the power to grant the particular type of relief sought," an inmate was required to invoke and exhaust the administrative remedy under the Inmate Grievance statute before a court could adjudicate the inmate's common-law tort action for money damages against a correctional officer.

■ In light of the language of Art. 41, § 4–102.1(k), and our decisions under that statutory provision, it seems clear that a person confined under the custody of the Division of Correction or the Patuxent Institution, "who has *any* grievance or complaint against *any* officials or employees of the Division of Correction or the Patuxent Institution," Art. 41, § 4–102.1(c)(emphasis added), must invoke and exhaust the

administrative remedy under the Inmate Grievance statute before obtaining an adjudication under an alternative common-law or state statutory judicial remedy. If a habeas corpus proceeding, by an inmate asserting an entitlement to immediate release, were nothing more than a common-law or statutory remedy, we would agree with the Division that the inmate would be required first to invoke and exhaust the administrative procedure.

██ A habeas corpus proceeding, however, is not simply a common-law or statutory remedy over which the General Assembly has full control. Instead, it is a remedy authorized and protected by the Constitution of Maryland. MD. CONST., Art. III, § 55 provides that "[t]he General Assembly shall pass no Law suspending the privilege of the Writ of Habeas Corpus." While the legislature may "reasonably" regulate the issuance of the writ, any legislatively imposed regulations must not impair the fundamental right to the substantive remedy of habeas corpus. *Olewiler v. Brady*, 185 Md. 341, 346,44 A.2d 807, 809 (1945); *see also State v. Glenn*, 54 Md. 572 (1880) and cases cited therein.

Without any extended discussion of the issue, this Court has reviewed habeas corpus petitions by prisoners who had not presented their claims to the Inmate Grievance Office. *See, e.g., Gluckstern v. Sutton*, 319 Md. 634, 574 A.2d 898, *cert. denied sub nom Henneberry v. Sutton*, 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 331 (1990). In *State v. McCray*, we reversed an order granting relief requested in several consolidated habeas corpus petitions filed by inmates who alleged their confinement at, and conditions at, Patuxent Institution constituted cruel and unusual punishment. Although we reversed the order in light of the predecessor to the current Inmate Grievance Act, we pointed out that the inmates did not allege or establish that they were "entitled to be released or discharged from confinement." 267 Md. at 146, 297 A.2d at 283. Further in *Fincher (Brown) v. Warden*, 216 Md. 644, 139 A.2d 842 (1958), we held that habeas corpus was not available until the entire legal portion of the petitioner's sentences had been

served. From these cases we can distill the principle that pursuant to MD. CONST., Art. III, § 55 an inmate is not required to utilize the inmate grievance procedure, and courts will entertain an inmate's petition for habeas corpus when the plaintiff alleges entitlement to immediate release and makes a colorable claim that he or she has served the entire sentence less any mandatory credits.

### III.

Having determined that plaintiffs were appropriately before the circuit court, we next turn to whether plaintiffs [10] were entitled to have good-conduct credits calculated at a rate of ten days per month rather than the five days per month used by the Division in calculating plaintiffs' good-conduct credits with respect to sentences imposed after October 1, 1992. For the reasons set forth below, we hold that plaintiffs are entitled to good-conduct credits at the rate of ten days per month for those sentences imposed at a new sentencing after October 1, 1992, and a rate of five days per month for those sentences imposed at a sentencing prior to October 1, 1992.

### A.

We begin with a discussion of diminution credits. Diminution credits are credits which can be "earned by inmates to reduce the lengths of their confinements." *See, e.g., Frost v. State,* 336 Md. 125, 128, 647 A.2d 106, 107 (1994). "Assuming an inmate does not forfeit diminution credits as the result of a disciplinary hearing, the inmate can earn the right to be released on a date much sooner than that designated by his or her original term of confinement." *Frost,* 336 Md. at 128, 647 A.2d at 108 (citations omitted). Once the inmate accumulates "sufficient credits to earn entitlement to release, the inmate is deemed released under '[m]andatory supervision.'" *Id.* Mandatory supervision is "a conditional release

---

**10.** This first substantive issue is applicable only to Hood and Fields. The trial court ruled against Sayko, and the issue was not appealed.

from imprisonment which is granted to any person serving a term of confinement of more than 12 months who was sentenced ... to the jurisdiction of the Division of Correction, and who has served the term or terms, less" diminution credits. Art. 41, § 4–501(13).

There are four types of diminution credits: good-conduct, work (or industrial), educational, and special project credits. Art. 27, § 700; *see also Frost*, 336 Md. at 128, 647 A.2d at 107. Good-conduct credits, which are the subject of this appeal, are different from other diminution credits in that they are deducted "in advance from the inmate's term of confinement, subject to the inmate's future good conduct." Art. 27, § 700(d); *see also Frost*, 336 Md. at 128, 647 A.2d at 107. Prior to October 1, 1992, inmates, upon incarceration, were prospectively awarded five days of good-conduct credits for each month of their sentence. Md.Code (1957, 1992 Repl. Vol.), Art. 27, § 700(d)(2).

## B.

In 1992, Art. 27, § 700 was amended by Ch. 588 of the Acts of 1992. Under the new version, an inmate is to be prospectively awarded good-conduct credits at a rate of ten days per month unless the term of confinement includes a sentence for a crime of violence or the "manufacturing, distributing, dispensing, or possessing a controlled dangerous substance as provided for under Article 27, § 286." Art. 27, § 700(d)(2) & (3).[11] The legislature, however, expressly provided that § 700 would only apply to "a *term of confinement* imposed on or after October 1, 1992." Ch. 588 § 2 of the Acts of 1992 (emphasis added). The definition of term of confinement, however, was left unchanged.

---

11. If any one of the sentences composing the term of confinement is a crime of violence or any one of the specified crimes involving a controlled dangerous substance, then good-conduct credits are calculated a rate of five days per month. Art. 27, § 700(d)(2). As we noted earlier, Fields's heroin conviction was not under § 286, but rather under § 287 and, thus, would not be deemed drug related in the context of this statute.

## C.

 In this case, we are called upon to determine the effect of the 1992 amendment, that is, whether § 700's definition of term of confinement bars the application of the ten days per month rate to inmates who were released on mandatory supervision and then returned to incarceration on a sentence for a new nonviolent, non-drug offense to be served concurrently or consecutively with the balance of the sentence reimposed for violation of the terms of the release. The resolution of this issue turns, in part, on the meaning of "term of confinement."

The phrase "term of confinement" encompasses a variety of meanings in the Maryland Code depending on the circumstances. Article 27, § 700 contains its own definition of "term of confinement." According to Art. 27, § 700(a), "term of confinement" means:

"(1) The length of the sentence for a single sentence; or (2) The period from the first day of the sentence beginning first through the last day of the sentence ending last for: (i) Concurrent sentences; (ii) Partially concurrent sentences; (iii) Consecutive sentences; or (iv) A combination of concurrent and consecutive sentences."

 The Division argues that the definition provided in § 700(a) clearly indicates that only five days a month good-conduct credits are to be awarded to an inmate based on a term of confinement that includes both a pre-October 1, 1992 sentence and a post-October 1, 1992 sentence. However, even where a statute seems clear, we are not "precluded from looking at the purpose of the statute." *State v. Thompson,* 332 Md. 1, 7, 629 A.2d 731, 734 (1993). According to the Bill Analysis of the Senate Judicial Proceedings Committee for House Bill 1089, Ch. 588 of the Acts of 1992 was passed for the purpose of relieving "prison overcrowding by moving nonviolent offenders through the system at a faster pace." Moreover, Ch. 588 was also intended to create an incentive for nonviolent offenders "to be on good behavior, because they will have more 'good-conduct' credits to lose if they cause

trouble." Bill Analysis of the Senate Judicial Proceedings Committee for House Bill 1089.

The clause restricting the effective date of the 1992 amendment to Art. 27, § 700 was added at the request of the Division which expressed concern that recalculating good-conduct credits "retroactively" would be administratively burdensome. Maryland Department of Public Safety and Correctional Services, Position on Proposed Legislation on House Bill 1089 (February 27, 1992) ("We stress that any retroactive application to inmates in the standing population will involve manual recomputation of time records—an enormous task for our already understaffed commitment offices."). Although not part of the legislative history, we note that Delegate John S. Arnick, one of the bill's sponsors and the then-chairman of the House Judiciary Committee, clarified his view of the purpose of this restriction in a letter dated November 25, 1992:

"[T]he word 'imposed' was intended to mean just that. If a person is sentenced before October 1, he is not eligible for the additional credits. A person sentenced on or after October 1 will receive the additional credits.

The reason for this is that the Division of Corrections indicated that it would be administratively impossible and fiscally prohibitive to recalculate good time credits for prisoners currently incarcerated. As you know, this deduction is made at the front end of the sentence. It would not be feasible to make an additional calculation for the 20,000 current inmates."

It should be pointed out that the definition of "term of confinement" was not amended by the 1992 amendment. In fact, as the Court of Special Appeals noted in the instant case in one of its opinions being reviewed here, "it appears that the Legislature gave little thought to the definition of 'term of confinement' when it enacted Ch. 588 [the 1992 amendment to § 700]." "Term of confinement" originated in Ch. 354 of the Acts of 1991, and the legislative history of that section indicates that it was designed "to ensure that inmates serving

more than one sentence at a time [would] not receive good-conduct credits for more than one sentence."

It is a "fundamental principle that statutory construction is approached from a ' " 'commonsensical' " ' perspective." *Frost,* 336 Md. at 137, 647 A.2d at 112 (quoting *Richmond v. State,* 326 Md. 257, 262, 604 A.2d 483, 486 (1992), in turn quoting *United States v. Universal Corp.,* 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260, 264 (1952)). An examination of the use of the phrase "term of confinement" reveals that its interpretation is not as clear as the Division would have us believe. A Senate Judicial Proceedings Committee floor report explaining House Bill 1089, which changed the rate for awarding good-conduct credits, used the term *sentence* rather than *term of confinement* and stated that: "This bill may be applied prospectively only (i.e. to persons *sentenced* on or after the effective date of the bill)." (Emphasis added). Shortly after the statute at issue was enacted, one of the sponsors of that bill, Delegate John Arnick, was asked to explain the bill. He stated: "If a person is *sentenced* before October 1, he is not eligible for the additional credits. A person *sentenced* on or after October 1 will receive the additional credits." (Emphasis added).

The Division posits that to make separate calculations based on date of sentence rather than a single calculation for all of an inmate's credits for the whole period of confinement would be difficult to administer. We should not adopt the Division's theory merely because to do otherwise would saddle the Division with more complex calculations. Similarly, it is suggested that the legislature intended to simplify this process administratively as evidenced by the fact that the statute specifically provides that when an inmate is serving sentences for both violent and nonviolent offenses, the inmate is to be awarded credits at the single rate of five days per month. This situation, however, is different from a situation in which credits are awarded at separate rates for those sentences imposed before October 1, 1992, and those imposed after that date. In the case of an inmate serving sentences for both violent and nonviolent offenses, the legislature may logically

have determined that an inmate incarcerated for a violent offense should not benefit from the increase in good-conduct credits and should not be part of the legislative efforts to decrease overcrowding in prison. Moreover, a violent inmate should not benefit solely because the inmate has also committed nonviolent offenses. On the other hand, the legislature has made no similar determination with respect to inmates who were serving sentences imposed prior to October 1, 1992. In fact, the legislative history reveals that the clause restricting the applicability of the 1992 amendment to sentences imposed after October 1, 1992 was added at the request of the Division to reduce the administrative burden of recalculating the credits for all inmates in prison at that time. This is less of an administrative burden with respect to an inmate sentenced prior to October 1, 1992 who later commits another nonviolent, non-drug related offense and has a new sentence imposed after October. 1, 1992. The Division already has to review and recalculate both good-conduct credits for such inmates.

"Statutes that are clear when viewed separately may well be ambiguous where their application in a given situation ... is not clear." *Gardner v. State*, 344 Md. 642, 648, 689 A.2d 610, 613 (1997). A plain reading of the statute as written also reveals that the statute is difficult, if not impossible, to apply without using principles of interpretation. For example, where an inmate is serving two consecutive sentences, one imposed before October 1, 1992 and one imposed after that date, it would be impossible to say that a single "term of confinement" was imposed either before or after October 1, 1992 because, in fact, the "term of confinement" was imposed both before *and* after that date. Even if the legislature had used the term "aggregate" in front of "term of confinement," there could be absurd results. If A were released 250 days prior to the expiration of A's sentence under mandatory supervision on a sentence which was imposed prior to October 1, 1992, for example, the result of a subsequent conviction imposed after October 1, 1992, using the method of calculating good-conduct credits advocated by the Division, would be

dramatically different based on whether A committed the subsequent crime on day 249 or day 251 after his release. If A committed the subsequent violation on the 249th day of mandatory supervision, A would be awarded good-conduct credits on the new offense at the rate of five days per month, whereas if A committed the same subsequent offense on the 251st day, one day after the mandatory supervision expired, A would be awarded good-conduct credits at the rate of ten days per month. Surely, the legislature did not indicate an intent to make such a nonsensical distinction.

 Finally, in interpreting Art. 27, § 700, we must examine the applicability of the rule of lenity, which requires any ambiguity in criminal penal statutes to be construed against the state and in favor of the defendant. *See, e.g., Tapscott v. State,* 343 Md. 650, 654, 684 A.2d 439, 441 (1996); *State v. Purcell,* 342 Md. 214, 229, 674 A.2d 936, 944 (1996). This rule is significant in that it forbids courts from extending " 'punishment to cases not plainly within the language' " of the statute. *State v. Fabritz,* 276 Md. 416, 422, 348 A.2d 275, 279 (1975)(quoting *State v. Archer,* 73 Md. 44, 57, 20 A. 172, 172 (1890)), *cert. denied,* 425 U.S. 942, 96 S.Ct. 1680, 48 L.Ed.2d 185 (1976). While Art. 27, § 700 does not establish punishment, it does set forth a significant procedure for shortening the punishment the inmate receives. We see no reason why the rule of lenity should not be utilized in the instant case. Applying this rule, we note that construing the statute in favor of plaintiffs leads to the interpretation that nonviolent inmates should be eligible for ten days of good-conduct credits per month rate for new sentences after October 1, 1992.

### D.

 In light of the legislative history of the 1992 amendment to Art. 27, § 700, the applicability of the rule of lenity to this case, and what common sense dictates, we reject the notion that all sentences that overlap or run consecutively must aggregate for all purposes to a single term of confinement. Instead, we hold that sentences imposed before Octo-

ber 1, 1992 are separable from new sentences imposed after that date. For the purposes of good-conduct credits, new sentences imposed after October 1, 1992 should be construed as separate instead of aggregated as part of one single term of confinement.

The effect of this decision is that, for those sentences imposed before October 1, 1992, good-conduct credits should be awarded at the old rate of five days per month. Those nonviolent, non-drug related sentences imposed during a new sentencing after October 1, 1992 should carry good-conduct credits at the rate of ten days per month.

### E.

Therefore, Fields should earn credits at the rate of five days per month with respect to the remainder of his original seven-year sentence for housebreaking and violation of probation for his heroin conviction. With respect to all of Fields's other sentences, including the reimposition of the five years that had originally been suspended in conjunction with Fields's sentence for housebreaking, Fields should be awarded good-conduct credits at a rate of ten days per month.

Hood's sentences are similarly separable. We, thus, hold that Hood should be awarded good-conduct credits at a rate of five days per month for the remainder of his original four-year sentence for theft, but not with respect to the four years that were suspended. All of Hood's post-October 1, 1992 sentences, including the four years that had been suspended, should carry good-conduct credits at the rate of ten days per month.

### IV.

 The final issue we will address is whether the Division possesses the authority to offset street-time credits [12] awarded

---

**12.** Street time is credit for time spent between release on parole and revocation of parole that is granted under the discretion of the MPC pursuant to the authority of Art. 41, § 4–511(d).

by the MPC by rescinding other credits earned by an inmate. We find that the Division does not. We premise this conclusion on two related findings. First, we reject the Division's theory that the Division was not exercising authority when it deducted street-time credits from plaintiffs' [13] remaining diminution credits, but rather was merely carrying out the orders of the MPC. Second, we find that the Division is without authority to adjust the award of diminution credits given by the MPC.

### A.

First, we reject the Division's argument that the Division is required to adjust an award of street-time credits against the diminution credit balance. The Division's theory is based on the premise that when an inmate is released on mandatory supervision, that inmate is receiving the benefit of the diminution credits the inmate earned while incarcerated. As each day goes by and the former inmate receives the benefit of the diminution credits by spending a day of the sentence out on the street, these credits become "vested." To allow plaintiffs to have all diminution credits not revoked by the MPC would result in the plaintiffs benefitting twice from the same credits. Under this vesting theory, the Division is not exercising authority, but merely effectuating the parole commissioner's orders. We do not agree.

Following the Division's vesting theory to its logical, or in this case illogical, conclusion, the MPC does not "award" street-time credits at all, but rather merely tells the Division the number of days the inmate spent out of the Division's custody which will be counted against him or her, *i.e.*, deducted from his or her previously earned diminution credits. Such an interpretation of street-time credits is especially illogical in light of statutory language and context. *Cf. Atkinson v. State,* 331 Md. 199, 212, 627 A.2d 1019, 1025 (1993)(noting that, whether plain or not, statutory language must be read in its

---

**13.** This final issue is applicable only to Fields and Sayko.

context); *Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 514, 525 A.2d 628, 632 (1987)(noting that even where statutory language is plain, its meaning is controlled by its context). Article 41, § 4–511(d)(1) is the statutory authority for the granting of street-time credits. Section 4–511(d)(1) states that upon revocation of mandatory supervision "the prisoner shall serve the remainder of the sentence originally imposed unless the [MPC] . . ., in [its] discretion, grants credit for time between release on [mandatory supervision] and revocation of [that mandatory supervision]." Deducting credits surely is not the same as granting credits. Subsection (d)(1) first requires an inmate to serve the remainder of his or her sentences originally imposed, and then creates an exception, *i.e.,* if the MPC decides otherwise the MPC can reduce the sentence by granting the inmate credit for the time he or she was on the street. Subsection(d)(2) creates an exception to the exception. It states that an inmate may not receive street-time credits if: "(i) At the time that [mandatory supervision] was revoked the prisoner was serving a sentence for a violent crime; and (ii) The [mandatory supervision] was revoked due to a finding that the prisoner committed a violent crime while on [mandatory supervision]." In other words, in this limited circumstance, the MPC does not have the discretionary power to award the inmate street-time credits. This exception makes no sense under the Division's interpretation. The legislature could not have intended Art. 41, § 4–511(d) to mean that a violent offender cannot have time spent on the street credited against him or her. Therefore, we cannot accept the Division's interpretation.

Furthermore, street-time credits are not equivalent to diminution credits as evidenced by the discretionary power given the MPC with respect to street-time credits and, thus, street-time credits cannot represent the vesting of diminution credits. Under Art. 41, § 4–511(d)(1), the MPC has the authority to grant an inmate "credit for time between release on parole and revocation of parole." COMAR 12.08.01.22F(7)(e) makes

it clear that this is within the absolute discretion of the MPC.[14] In other words, the MPC may choose to grant an inmate credit for all days from release on mandatory supervision until the revocation of that release, choose to grant the inmate some street-time credits, or choose to grant no street-time credits at all. In light of this last observation, the Division's vesting theory also makes little sense. If the credits were truly "vested," it makes no sense for the MPC to be given discretion to deny the inmate credits. We find no authority for the proposition and therefore also reject the creative notion that the diminution credits somehow become vested at the moment the MPC grants street-time credits.

### B.

Moreover, we find that the Division is without authority to adjust the award of diminution credits given by the MPC. The authority to adjust street-time credits, pursuant to Art. 41, § 4–511(d), is within the absolute discretion of the MPC. COMAR 12.08.01.22F(7)(e). Once the MPC grants street-time credits, the Division does not have authority to deduct street-time credits from diminution credits. *Frost*, 336 Md. at 142–43, 647 A.2d at 115 (interpreting Art. 27 § 700(b) as "providing that the Division of Correction's authority to revoke certain diminution credits and a prisoner's entitlement to earn them is subject to the [MPC's] authority as delineated in Article 41, § 4–612, not vice versa").

When the Division deducts the street-time credits from the diminution credits, as they did here, it essentially offsets the award of street-time credits and nullifies it. As discussed, the Division is without authority to do this. We therefore hold that the Division improperly adjusted plaintiffs' diminution

---

14. In its own manual, the Division recognizes this discretion, even though the same procedure manual provides for the Division to adjust diminution credits by the amount of street-time credits awarded by the MPC. Division of Correction Commitment Procedure Manual, Chapter 90–134–6(revised 9/15/95).

credits by the amount of street-time credits awarded plaintiffs by the MPC.

*JUDGMENTS OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONERS EQUALLY.*