751 A.2d 462

**Ronald F. MOATS, Warden Maryland Correctional Training Center**

**v.**

**Thomas SCOTT.**

**No. 108, Sept. Term, 1999.**

Court of Appeals of Maryland.

May 9, 2000.

Karl A. Pothier, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for petitioner.

Stephen Z. Meehan (David C. Wright, Joseph B. Tetrault, on brief), Chestertown, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

WILNER, Judge.

For the fourth time in less than three years, we are called upon to determine the proper method of calculating good conduct credits for an inmate sentenced to the Division of Correction. *See Md. House of Correction v. Fields*, 348 Md. 245, 703 A.2d 167 (1997), *Beshears v. Wickes*, 349 Md. 1, 706 A.2d 608 (1998), and *Dept. of Corrections v. Henderson*, 351 Md. 438, 718 A.2d 1150 (1998). In *Fields* and *Wickes*, we attempted directly to divine legislative intent from the text of the two relevant statutes. In *Henderson* and in this case, the problem arose principally from what we said and did in *Fields* or *Wickes*.

### Preface

One of the problems that lurks in this case—a discrete one which neither party has addressed—arises from the supposition that, when a court imposes a sentence of imprisonment, immediately suspends execution of all or part of that sentence in favor of probation, and later revokes the probation and orders the defendant incarcerated, the court has, at that time, "reimposed" the prison sentence. We have contributed to that

false notion by occasionally using the term "reimpose" when describing the effect of the revocation. As we pointed out in *Coleman v. State,* 231 Md. 220, 189 A.2d 616 (1963) and in *Hanson v. Hughes,* 52 Md.App. 246, 447 A.2d 892, *aff'd for reasons set forth by Court of Special Appeals,* 294 Md. 599, 451 A.2d 664 (1982), that is not, in fact, what occurs.

When a defendant is convicted of a crime that carries a penalty of incarceration, the court may, of course, impose a prison sentence up to the maximum term allowed, and, unless the court orders otherwise, that sentence will, routinely, be immediately executed; the defendant will be delivered promptly to the custody of the appropriate correctional agency to commence serving the sentence. Maryland Code, Article 27, § 641A(a) gives a court four other options. Section 641A(a)(1) permits the court to "suspend the *imposition or execution* of sentence and place the defendant on probation upon such terms and conditions as the court deems proper." (Emphasis added). Under that subsection, the court may either defer actual imposition of the sentence in favor of probation or it may impose the sentence and suspend execution of all of it in favor of probation. A third option—one that is frequently used—is the "split sentence" provided for in § 641A(a)(3). That subsection allows a court to "impose a sentence for a specified period and provide that a lesser period be served in confinement, suspend the remainder of the sentence and grant probation for a period longer than the sentence but not in excess of 5 years." Finally, under § 641A(a)(2), applicable at the moment in only five counties, the court is authorized to impose incarceration as a condition of probation. That approach, which is much in the nature of the "split sentence" provided for in § 641A(a)(3), normally involves either a short incarceration in a local detention center or some form of home detention as part of a longer period of probation. *See Bailey v. State,* 355 Md. 287, 734 A.2d 684 (1999).

In *Coleman,* we called attention to the distinction between the deferral of *imposition* of sentence, on the one hand, and the imposition of a sentence coupled with a suspension of

execution of the sentence, on the other. In *Coleman,* the Court imposed a two year sentence and immediately suspended execution of all of it in favor of probation. Some 18 months later, the court revoked the probation, which the clerk, in his/her docket entry, treated as the imposition of a new sentence. We held that to be error:

> "When the sentence in a criminal case is imposed and execution of the imposed sentence is conditionally suspended, as distinguished from the suspension of the imposition of sentence, and the defendant placed on probation, and thereafter the probation is stricken out, the defendant should not be re-sentenced. His original sentence is effective with the probationary provisions stricken out."

*Coleman,* 231 Md. at 222, 189 A.2d at 618.

That view was confirmed in *Johnson v. State,* 274 Md. 29, 33, 333 A.2d 37, 39 (1975), *Kaylor v. State,* 285 Md. 66, 73–74, 400 A.2d 419, 424 (1979), and *Hanson,* 52 Md.App. at 252, 447 A.2d at 895. Through our concurrence with the views expressed by the Court of Special Appeals in *Hanson,* we noted again that "there is a distinction between suspending the initial *imposition* of a sentence and suspending *execution* of a sentence already (or contemporaneously) imposed," and that, when imposing a "split sentence" under § 641A(a)(3), "[t]he court must impose the full sentence; it may then suspend execution of a part of it." *Id.* at 252–53, 447 A.2d at 895. Unfortunately, though not departing from this consistent view, we sometimes have lapsed into speaking in terms of the suspended part of the sentence being "reimposed" upon the striking of probation. *See, for example, Songer v. State,* 327 Md. 42, 49, 607 A.2d 557, 560 (1992). In most instances, that misstatement was harmless. Regrettably, in *Fields,* as we shall see, it was not entirely harmless.

█ We take this opportunity once again to confirm what we said in *Coleman* and clarify that, when a court imposes a sentence and then, acting under either § 641A(a)(1) or (3), suspends execution of all or part of that sentence in favor of probation, and later strikes the probation and directs execu-

tion of all or part of the previously suspended part of the sentence, the court does *not*, at that time reimpose all or any part of the sentence. The full sentence has already been imposed and does not need any reimposition. The effect of the court's action is simply to lift the previously ordered suspension and direct execution of the now unsuspended part. In those rather rare situations in which the court, acting under § 641A(a)(1), has deferred imposition of sentence in favor of probation and later revokes the probation, it proceeds then to impose sentence for the first time.

### *Fields, Wickes, and Henderson*

As we pointed out in both *Fields* and *Henderson*, inmates in the State correctional system are eligible to earn four kinds of credits against their sentences—credits for good conduct, for performing work tasks assigned to them, for satisfactory progress in vocational or other educational and training courses, and for special work projects. Credits for work tasks (five days a month), vocational and educational courses (five days a month), and special projects (up to ten days a month) are awarded monthly, as earned. Good conduct credits, however, are deducted in advance, subject to being rescinded if the inmate misbehaves in various ways.

Until October 1, 1992, good conduct credits were deducted for all inmates at the rate of five days a month. The aggregate deduction was made in advance from the inmate's "term of confinement," which was defined as the length of a single sentence or, if the inmate was serving multiple sentences, whether concurrent or consecutive, as the period from the first day of the sentence beginning first through the last day of the sentence ending last. *See* former Maryland Code, Article 27, § 700; current §§ 3–701 and 3–704 of the Correctional Services Article. In 1992, the Legislature made the first of two changes that unintendedly complicated this fairly simple arrangement. By 1992 Md. Laws, ch. 588, the General Assembly (1) amended former § 700(d)(2) to retain the good conduct credit of five days a month for inmates "whose term of confinement includes a consecutive or concurrent sentence

for either a crime of violence as defined in Article 27, § 643B of the Code" or certain controlled dangerous substance offenses prohibited by § 286 of Article 27, and (2) enacted a new § 700(d)(3) to increase the rate for all other inmates to ten days a month. An uncodified § 2 of the 1992 Act made the new law applicable only to a term of confinement imposed on or after October 1, 1992.

As we noted in *Henderson*, that law, for the beneficent purpose of doubling the good conduct credit for certain inmates, not only created a distinction between the two classes of inmates—those serving sentences for violent crimes or crimes listed in § 286 and those serving sentences for all other crimes—but:

> "[t]hat, when coupled with the prospectivity language of Section 2 of the Act, created a double problem: it brought into question whether an inmate serving a sentence imposed prior to October 1, 1992 as well as a sentence imposed after that date was entitled to the additional five days a month credit on the later sentence and, even if such an inmate ordinarily would get the additional credit, it raised the question of whether that would be the case if the earlier sentence was for a violent or listed drug offense."

*Henderson*, 351 Md. at 442, 718 A.2d at 1152.

*Fields* involved three inmates who had been sentenced prior to October 1, 1992, either paroled or released on mandatory supervision, and reincarcerated after October 1, 1992, to serve a remaining part of the pre–1992 sentence as well as one or more new sentences imposed after October 1, 1992, for conduct committed while they were on release. The common issue presented in all three cases was whether those inmates were entitled to good conduct credits at the 10–day a month rate on the sentences imposed after October 1, 1992. The Division of Correction, in accordance with the general legislative directive in former § 700 of Article 27, consolidated all of the sentences into one term of confinement, which began before October 1, 1992, and thus determined, in light of the prospectivity section of the 1992 Act, that the inmates were

entitled to only five days a month on the aggregate term of confinement.

That approach, founded on a strict application of the concept and definition of "term of confinement," precluded inmates who received a post–1992 sentence for a crime that was neither a crime of violence under § 643B nor proscribed by § 286 from receiving the benefit of the additional five days a month for that new sentence, and we did not believe that the Legislature intended that result. We discerned that the legislative intent behind the single "term of confinement" concept was simply to ensure that inmates who were serving multiple sentences received only the single credit and not separate credits against each sentence, that, in light of the history and apparent purpose of the 1992 law, application of that concept to the situation where the inmate was serving one or more sentences imposed before October 1, 1992, and one or more imposed afterward, created an ambiguity as to how much credit should be applied to the later sentence(s), and that, under the rule of lenity, the statute had to be construed in favor of the inmates. To achieve that result, and implement the legislative purpose, we held that, for purposes of deducting good conduct credits, new sentences imposed after October 1, 1992 were to be construed as separate sentences, instead of aggregated as part of a single term of confinement commencing prior to that date. Good conduct credits on those post–1992 sentences, we declared, were to be calculated at the rate of ten days a month.

As noted, the *Fields* case involved three inmates—Fields, Sayko, and Hood. All of the sentences received by Sayko and Hood, both before and after 1992, were for non-violent, non-drug-related crimes. The situation with Fields was different. He had two pre–1992 sentences—one, of ten years, with five years suspended, for daytime housebreaking, which, at the time, was included in Article 27, § 643B as a crime of violence, and a consecutive two-year sentence for possession of heroin, which was neither a violent crime nor one created under § 286 of Article 27. He was released on mandatory supervision in May, 1992, but, in February, 1994, he was convicted of theft

and malicious destruction of property—non-violent, non-drug-related crimes—for which he received an 18–month sentence. Those convictions had two collateral consequences: (1) he was found in violation of the probation imposed as part of the split sentence received for the daytime housebreaking, and the five-year portion of that sentence that had been suspended was ordered executed, and (2) he was also found in violation of a probation imposed for another, unrelated offense, leading to the execution of an additional, consecutive, six-month sentence.

When Fields was returned to prison, the good conduct credits that had been deducted from the initial seven-year term of confinement were rescinded, leaving some part of that term to be served. The Division of Correction treated the additional five-year part of the daytime housebreaking sentence, as to which the suspension had been lifted, and the new, concurrent, 18–month sentence for theft and malicious destruction of property, as part of a single term of confinement that commenced prior to October 1, 1992, and thus deducted good conduct credits against those sentences at the rate of five days a month. We found that to be error. We concluded that, "[f]or the purposes of good-conduct credits, new sentences imposed after October 1, 1992 should be construed as separate instead of aggregated as part of one single term of confinement." On that basis, we held that "Fields should earn credits at the rate of five days per month with respect to the remainder of his original seven-year sentence for housebreaking and violation of probation for his heroin conviction" and "[w]ith respect to all of Fields's other sentences, including the reimposition of the five years that had originally been suspended in conjunction with Fields's sentence for housebreaking, Fields should be awarded good-conduct credits at a rate of ten days per month." *Id.* at 268, 703 A.2d at 178–79.

In *Wickes,* we applied essentially the same principle stated in *Fields.* In 1979, Wickes was convicted of rape, a crime of violence under § 643B, and was sentenced to a term of 20 years. In 1993, through the application of various diminution credits, he was released on mandatory supervision. In 1995,

he was convicted of third-degree burglary—not a violent crime under § 643B—and sentenced to seven years. That conviction led to the revocation of his mandatory supervision release and the rescission of 1,000 good conduct credits that had been deducted from the rape sentence. As had been done with Fields, the Division of Correction treated the new sentence and the unserved part of the 1979 sentence as parts of one term of confinement, commencing in 1979, and thus awarded good conduct credits against the aggregate at the rate of five days a month. The Division sought to distinguish *Fields* on the ground that Wickes's term of confinement included a sentence for a violent crime, thereby rendering him ineligible for the higher credit. We rejected the distinction and, in conformance with our holding in *Fields*, held that the pre–1992 sentence for rape was not to be aggregated with the post–1992 sentence for a non-violent crime and that good conduct credits against the latter were to be at the ten-day a month rate.

### The Current Situation and This Case

We noted earlier that the 1992 law was one of two enactments that affected the method by which good conduct credits were to be calculated. The second came with 1994 Md. Laws, ch. 712. The major thrust of the bill, a comprehensive one which emanated from the legislatively-created Committee to Revise Article 27, was to repeal the existing statutes dealing with burglary and breaking offenses in favor of new statutory offenses. One of the statutes repealed was § 30(b) of Article 27, which made the breaking of a dwelling in the daytime with intent to commit murder, felony, or theft a felony carrying a maximum penalty of ten years. In its place, the offense of breaking into a dwelling, either at night or during the daytime, with the intent to commit theft or a crime of violence was made first degree burglary, carrying a penalty of 20 years (new § 29), and the offense of breaking into a dwelling with intent to commit *any* crime was made third degree burglary, with a possible punishment of 10 years (new § 31).

Consistently with its repeal of the existing offense of daytime housebreaking, the Legislature amended § 643B(a) to remove that offense (and burglary as well) from the list of crimes · of violence. In one sense, the deletion of daytime housebreaking was simply a conforming amendment. Section 643B(a) included as a crime of violence "daytime housebreaking under § 30(b) of this article," and, with the repeal of § 30(b), no such crime would exist. As a policy matter, the Legislature decided not to include any of the new burglary or breaking offenses in § 643B, which, in subsections (b) and (c), provided a mandatory sentence, without possibility of parole, of 25 years for persons convicted a third time of a crime of violence and a mandatory life sentence, without possibility of parole, for persons convicted a fourth time of such a crime.[1]

The Act took effect October 1, 1994. In § 3, the General Assembly specified that "the changes that are made to Article 27, § 643B of the Code by this Act shall apply prospectively only to defendants who are sentenced after the effective date of this Act and may not be construed to apply in any way to defendants who are sentenced before the effective date of this Act."

On August 11, 1992, respondent, Thomas Scott, was convicted in the Circuit Court for Baltimore City of daytime housebreaking, for which he was sentenced to ten years in prison, none of it to be served. The court suspended nine years, eight months, and twelve days of the sentence in favor of five years

---

1. The legislative intent with respect to the amendment to § 643B was expressed in the form of a Committee Note, included in the bill as a guide but not as part of the law itself, which states:

"This is a substantive change that is intended to enhance the fairness and uniformity of sentencing practices in the State. The Committee believes that the mandatory minimum sentences established in this section should be applicable only to crimes against persons or crimes that directly involve a threat to human life. In addition, the deletion of the crime of daytime housebreaking is a logical change because this bill eliminates the distinction between daytime and nighttime housebreaking and doubles the penalty for this offense. See new § 29. Under Section 3 of this bill, this change will apply prospectively to cases in which a defendant is sentenced after the effective date of the bill."

of probation and, by dating the sentence back to April 30, 1992, gave him credit for an additional three months and eleven days. On May 26, 1993, apparently as a result of a new burglary charge, Scott was found in violation of his probation, whereupon the court lifted the suspension it had previously ordered and directed that two years of the sentence be served and that eight years of it remain in suspension. Four years of probation was attached to the newly suspended part of the sentence. In June, 1993, the District Court found Scott in violation of a probation that it had previously imposed on a theft conviction and directed execution of a sentence of 18 months, less 60 days for time already served, to be served consecutively to any other sentence. In July, 1993, Scott received a concurrent 90–day sentence from the District Court for making a false statement to a police officer, and, in August, 1993, he received a consecutive 18–month sentence from the Circuit Court for Baltimore City for the new burglary. Like daytime housebreaking, burglary, at the time, was a crime of violence under § 643B.

Both the Division of Correction and the courts below regarded the 10–year sentence as having been imposed (or reimposed) in May, 1993 and the District Court sentence for theft as having been imposed in June, 1993, notwithstanding that those sentences had actually been imposed earlier. The various sentences that now brought Scott to the Division of Correction aggregated 58 months (24 months for daytime housebreaking, plus 16 months (net) resulting from the violation of probation, plus 18 months for the burglary). The Division of Correction deducted 290 good conduct credits (five per month for 58 months) and thus determined Scott's mandatory supervision release date to be May 31, 1997.

Scott was released on parole in September, 1994. Although the Maryland Parole Commission issued a parole violation warrant in October, 1995, Scott was not apprehended until February, 1997, when he was arrested for assault and a handgun violation. Those charges were nol prossed, but his parole was revoked and he was returned to the Division of Correction in April, 1997. Scott had been on parole for 956

days. The Parole Commission allowed him 212 days of "street time," leaving 744 days to be served. That put his maximum expiration release date at April 9, 2000. After allowing him 55 days of work task credits and good conduct credits at the rate of five days a month, the Division determined that his mandatory release date would be November 9, 1998. At the time, the probation imposed in May, 1993, in connection with the August, 1992 conviction for daytime housebreaking had not been declared violated, and no part of the eight years of the sentence that had been suspended was ordered executed. In that regard, Scott's situation is unlike that of Fields.[2]

In February, 1998, Scott filed a petition for habeas corpus, in which he complained that he should have received good conduct credits at the rate of 10 days a month and that, if that credit were applied, he would be entitled to immediate release on mandatory supervision. Judge Beachley, sitting in the Circuit Court for Washington County, found Scott's situation substantively indistinguishable from that of Fields. He noted our holding in *Fields* that Fields was entitled to 10 days a month credit on the "reimposition of the five years that had originally been suspended in conjunction with Fields's sentence for housebreaking" and determined that "this passage resolves the instant case." Implicit in the *Fields* opinion, he said, "is that an inmate serving time for daytime housebreaking is entitled to ten [good conduct credits] per month as long as the term of confinement is imposed after October 1, 1992." Thus, he continued, "[b]ecause Scott's term of confinement was imposed *after* October 1, 1992—and because housebreaking was deleted as an Art. 27 § 643B crime of violence effective October 1, 1994—Scott is entitled to ten [good conduct credits] per month for any and all portions of his sen-

---

2. Although this information is not in the record before us, we have discovered from the docket of the Circuit Court for Baltimore City that, in March, 1998—11 months after Scott's return to prison—the court did find a violation of Scott's probation but that it ordered execution of only 22 days of the suspended part of the sentence, commencing February 9, 1998. The docket entries seem to be in conflict as to whether the court continued any part of the probation or terminated it altogether. In either event, the order would not appear to affect the issue before us.

tence after October 1, 1994." Judge Beachley determined, in light of *Fields*, that Scott should receive credits of 5 days a month for the 16–month period from May 26, 1993 to September 30, 1994, and ten days a month for the succeeding 42 months. Applying the credits in that manner, Judge Beachley determined that Scott's mandatory supervision release date was April 12, 1998. As his decision was rendered in June, 1998, he concluded that Scott was entitled to immediate release, and so ordered.

The Court of Special Appeals agreed with Judge Beachley that *Fields* controlled. It read *Fields* as concluding that "Fields's good conduct credits accrued at the rate of ten days per month for Fields's post-October 1, 1992 conviction for daytime housebreaking." *Moats v. Scott,* No. 1402, September Term, 1999, filed May 20, 1999, at 6 (unreported). The appellate court found that the facts in Scott's case were "almost identical," that "[t]he suspended portion of [Scott's] sentence for daytime housebreaking was *reimposed* on 24 May 1993" and that he was entitled, "as was Fields, to good conduct credits calculated at the rate of ten days per month." *Id.* (emphasis added). Scott maintains that view. He asserts to us that "[t]he courts below were right in affording [him] the same relief this Court afforded Fields."

There are two problems with the result and the analysis. One problem is that this case is *not* the same as *Fields*. *Fields* was based on the proposition that, when the court revoked Fields's probation and directed execution of the previously suspended five-year segment of the sentence for daytime housebreaking, it had, after October 1, 1992, "reimposed" a five-year sentence, which thus carried the higher 10–day a month credit. That did not occur in Scott's case. As noted, Scott's probation was not revoked until March, 1998, and, even then, no part of the previously suspended eight-year segment remained to be served. The only effect that Scott's sentence for daytime housebreaking had upon his return to the Division of Correction in April, 1997, was the disallowance of 744 days of "street time," which Scott would be required to serve on the unexpired part of the August, 1992 original sentence.

That distinction, alone, would not direct a different result, however. As Judge Beachley correctly noted, we directed that Fields receive 10 days a month on the unsuspended part of the daytime housebreaking sentence even though the supposed "reimposition" of that sentence occurred in May, 1994—five months before the 1994 enactment that removed daytime housebreaking as a crime of violence under § 643B took effect. If we chose to ignore both the effective date of that Act—October 1, 1994—and § 2 of it, making that provision prospective only, Judge Beachley could hardly be criticized for effectively doing the same thing. He did point out "the *Fields* paradox in which the inmate received ten [good conduct credits] per month effective May, 1994, some five months before daytime housebreaking was deleted as a crime of violence."

That, indeed, is the more significant problem. The particular passage from *Fields* relied upon was, unfortunately, legally incorrect. It was incorrect for two reasons. First, it was based on a misunderstanding of the effect of the revocation of Fields's probation and the lifting of the suspension of the five-year portion of the sentence. We regarded that five-year term as being reimposed in May, 1994, and thus as constituting a post–1992 sentence, when, in fact, the entire 10–year sentence was imposed in 1988 and no part of it was ever "reimposed." The second error was in failing to recognize that, by virtue of § 2 of the 1994 enactment, the amendment made by that Act to § 643B did not affect any person sentenced for daytime housebreaking or burglary prior to October 1, 1994. As to all such persons, including Fields and Scott, daytime housebreaking and burglary remained crimes of violence under § 643B. In neither case was there a new sentence, imposed after October 1, 1994, for those offenses. Scott's sentence for daytime housebreaking was imposed in August, 1992, and, at that time, daytime housebreaking was a crime of violence, carrying good conduct credits at the rate of five days per month. Similarly, his consecutive 18–month sentence for burglary was imposed in August, 1993, when burglary also constituted a crime of violence. In accordance

with the plain language of the prospectivity section of the 1994 enactment, Scott was entitled to only five days a month good conduct credit on those sentences.

Scott was not entitled to be released on habeas corpus in June, 1998, because the Division of Correction was correct in its application of good conduct credits. The Division agreed, however, that, under its method of calculation, Scott was entitled to be released on mandatory supervision in November, 1998. As to him, therefore, the issue of release appears to be presently moot. The issue may or may not have significance if Scott gets into further difficulty and his mandatory supervision release is revoked. We shall therefore vacate the judgment of the Court of Special Appeals and direct that it remand the case to Judge Beachley for an order denying the petition for habeas corpus.

JUDGMENT OF COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND CASE TO JUDGE BEACHLEY FOR ORDER DENYING PETITION FOR HABEAS CORPUS; COSTS IN THIS COURT AND IN COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER, UNLESS WAIVED.